**WESTECH ENGINEERING, INC., Appellant,**

v.

**CLEARWATER CONSTRUCTORS, INC., A DIVISION OF PHELPS, INC., Appellee.**

No. 3–90–127–CV.

Court of Appeals of Texas, Austin.

July 1, 1992.

William Knolle, Hearne, Knolle, LeWallen, Livingston & Holcomb, Austin, for appellant.

Brian S. Greig, Mary S. Canfield, Fulbright & Jaworski, Austin, for appellee.

Before POWERS, JONES and B.A. SMITH, JJ.

B.A. SMITH, Justice.

This case involves a construction contract. In twenty-three points of error, the sub-contractor, WesTech Engineering, Inc. (WesTech), has challenged the trial court's determination that it entered into and subsequently breached an agreement with the general contractor, Clearwater Constructors, Inc. (Clearwater) to provide wastewater-treatment equipment. In sixteen points of error, WesTech attacks the legal or factual sufficiency of the evidence supporting the trial court's judgment that WesTech pay damages to Clearwater for breach of contract; in the remaining seven points of error, WesTech attacks particular conclusions of law underlying the judgment. Clearwater, in turn, has brought two cross-points complaining of the trial court's denial of consequential damages and certain expenses. We will affirm the judgment of the trial court as modified.

## THE CONTROVERSY

This appeal arises from WesTech and Clearwater's business dealings during 1987 and 1988. In the summer of 1987, the City of Austin undertook to expand and improve its Walnut Creek Wastewater Treatment Facility. Early in the process, the City retained the engineering firm of Camp, Dressar & McKee (CDM) to prepare the plans and specifications for the project. The City then solicited bids from general contractors, one of which was Clearwater Constructors.

WesTech was aware of the Walnut Creek Facility expansion and made bids to prospective general contractors, including Clearwater, in an attempt to secure a portion of the project. In these bids, WesTech offered to supply particular water-treatment equipment called for in the plant ex-

pansion. Specifically, WesTech sought to supply (1) two final clarifier mechanisms ("clarifiers"), and (2) a dissolved air flotation sludge thickening system ("DAF"). On June 30, 1987, Clearwater received a bid from WesTech on these two items and used WesTech's figures when formulating its own bid to the City.

In August 1987, the City chose Clearwater as the general contractor for the plant expansion project. In a letter of intent dated September 15th, notifying WesTech that it had been selected to supply the clarifiers and the DAF, Clearwater indicated that it would forward to WesTech a purchase agreement "in the very near future." WesTech received an unsigned agreement from Clearwater in mid-December.

A WesTech representative signed the purchase agreement but attached a letter to Clearwater indicating that the agreement contained terms that differed from WesTech's initial proposal. In its letter dated December 16, 1987, WesTech expressed its intent that the terms of its original proposal be "made a part of the [purchase] order." In its findings of fact, the trial court found that Clearwater subsequently signed the purchase agreement and dated it December 18, 1987. In separate findings, the trial court referred to this purchase agreement as "the contract" between the parties.

Initially, relations between WesTech and Clearwater proceeded normally. WesTech submitted to Clearwater specific data concerning both the clarifiers and the DAF. Problems arose, however, when the project engineering firm, CDM, determined that WesTech's clarifier equipment would not meet the particular specifications set out in the City's contract. The parties conducted a number of meetings to resolve these problems. For its part, WesTech supplied additional data on its proposed equipment, which Clearwater and CDM re-evaluated. Nevertheless, CDM decided that the WesTech equipment would not comply with the City's contract requirements.

Ultimately CDM concluded that the central-drive gears to be used in WesTech's clarifiers did not meet the durability requirements set out in the City's plans and specifications. Clearwater notified WesTech of its decision to seek an alternate source for the clarifiers and informed WesTech that it would be liable for Clearwater's increased procurement costs, if any.

In March 1988, WesTech supplied Clearwater with its DAF equipment submittal. Later that month, CDM engineers rejected WesTech's DAF submittal on the grounds that WesTech lacked the DAF installation experience called for in the City contract. Clearwater again notified WesTech of the rejection and informed WesTech it would be accountable for any increased costs in procuring DAF equipment from an alternate source. Eventually Clearwater obtained the clarifiers and the DAF from other companies, but at a cost greater than that contracted for with WesTech.

In March 1990, Clearwater filed suit against WesTech for breach of contract, hoping to recover its increased costs for the equipment. After a trial before the court, Clearwater was awarded $123,495 in "cover" costs resulting from WesTech's breach, plus prejudgment interest and attorney's fees. WesTech now appeals the trial court's judgment.

## STANDARDS OF REVIEW

At WesTech's request, the trial court filed findings of fact and conclusions of law in support of its judgment; some eighty-nine findings of fact and twenty-seven conclusions of law are contained in the record. In addition, the record contains a statement of facts from the proceedings.

*Findings of Fact*

We attach to findings of fact the same weight that we attach to a jury's verdict upon jury questions. *City of Clute v. City of Lake Jackson*, 559 S.W.2d 391, 395 (Tex.Civ.App.1977, writ ref'd n.r.e.). Findings of fact are reviewable for legal and factual sufficiency of the evidence by the same standards used to review jury findings. *Okon v. Levy*, 612 S.W.2d 938, 941 (Tex.Civ.App.1981, writ ref'd n.r.e.) (cit-

ing *Hall v. Villarreal Dev. Corp.*, 522 S.W.2d 195 (Tex.1975)).

■ An appellant who challenges the legal sufficiency of the evidence supporting an issue upon which it did not have the burden of proof must demonstrate that there is no evidence to support the adverse finding. *Raw Hide Oil & Gas, Inc. v. Maxus Exploration Co.*, 766 S.W.2d 264, 275 (Tex.App.1988, writ denied). In reviewing a no-evidence point, we consider only the evidence supporting the finding and we disregard all evidence to the contrary. *Best v. Ryan Auto Group, Inc.*, 786 S.W.2d 670, 671 (Tex.1990). If there is any evidence supporting the finding, we must overrule the point and uphold the finding.

■ When challenging the factual sufficiency of the evidence supporting an adverse finding upon which it did not carry the burden of proof, an appellant must demonstrate that there is insufficient evidence to support the adverse finding. *Maxus Exploration Co.*, 766 S.W.2d at 275–76. We will consider and weigh all the evidence in support of and contrary to the finding. *Plas–Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex.1989). The contested finding will be upheld unless we find that (1) the evidence is too weak to support the finding, or (2) the finding is so against the overwhelming weight of the evidence as to be manifestly unjust. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965). We will not substitute our judgment for that of the trier of fact merely because we reach a different fact conclusion. *Otis Elevator Co. v. Joseph*, 749 S.W.2d 920, 923 (Tex.App.1988, no writ).

■ On those issues on which an appellant has the burden of proof, it must prevail on a no-evidence challenge and then must demonstrate on appeal that the evidence conclusively establishes the issue in its favor as a matter of law. *Holley v. Watts*, 629 S.W.2d 694, 696 (Tex.1982). Only when the contrary proposition is es-tablished conclusively by the evidence will we sustain the point of error. *Meyerland Community Improvement Ass'n v. Temple*, 700 S.W.2d 263, 267 (Tex.App.1985, writ ref'd n.r.e.).

*Conclusions of Law*

■ The trial court's conclusions of law are always reviewable. *Middleton v. Kawasaki Steel Corp.*, 687 S.W.2d 42, 44 (Tex.App.1985, writ ref'd n.r.e.).[1] Conclusions of law will be upheld on appeal if the judgment can be sustained on any legal theory supported by the evidence. *Simpson v. Simpson*, 727 S.W.2d 662, 664 (Tex.App.1987, no writ). Incorrect conclusions of law will not require reversal, however, if the controlling findings of facts will support a correct legal theory. *Valencia v. Garza*, 765 S.W.2d 893, 898 (Tex.App. 1989, no writ). Moreover, conclusions of law may not be reversed unless they are erroneous as a matter of law. *Mercer*, 715 S.W.2d at 697.

## DISCUSSION

*Preservation of Error*

■ Before discussing the substantive issues of this case, we address Clearwater's contention that WesTech has not preserved error. Clearwater argues that WesTech failed to preserve error in two respects. First, WesTech failed to present to the trial court any request, objection or motion complaining of the issues WesTech has raised on appeal as required by Tex. Rule of Appellate Procedure 52. *See* Tex. R.App.P.Ann. 52 (Pamph.1992). Although Rule 52 was amended to allow factual-insufficiency points challenging a finding of fact in a bench trial to be raised for the first time on appeal, Clearwater argues that the amendment came after WesTech's time to perfect its appeal had expired. Second, Clearwater asserts that under the former rule WesTech failed to follow the procedures for preserving a no-evidence point.

---

1. In addition, when the appellate record contains specific findings of fact and conclusions of law as well as a statement of facts, the reviewing court may review the legal conclusions drawn from those facts in order to determine their correctness. *Mercer v. Bludworth*, 715 S.W.2d 693, 697 (Tex.App.1986, writ ref'd n.r.e.); *see also* 4 Roy W. McDonald, *Texas Civil Practice in District and County Courts*, § 16.10, at 35 (Frank W. Elliott ed., rev. ed. 1991).

We disagree with Clearwater's interpretation of Rule 52. As WesTech points out in its reply brief, challenges to a finding of fact's legal and factual sufficiency can be made for the first time by properly raising them as points of error. *Kissman v. Bendix Home Sys., Inc.*, 587 S.W.2d 675, 678 (Tex.1979); *Bluebonnet Express, Inc. v. Employers Ins.*, 651 S.W.2d 345 (Tex.App. 1983, writ ref'd n.r.e.). As the explanation following Rule 52 indicates, the purpose of the amendment is "to *clarify* appellate requisites from nonjury trials." Tex.R.App. P.Ann. 52 cmt. (Pamph.1992) (emphasis added). We agree with WesTech that the amendment to the rule does not change prior case law as much as it clarifies that law, and we conclude that WesTech has properly preserved error for appeal.

*Applicability of Uniform Commercial Code*

 In general, the Uniform Commercial Code (UCC), Tex.Bus. & Com.Code Ann. §§ 1.101–11.108 (1968, 1991 & Supp. 1992),[2] applies to the sale of goods. § 2.102 (1968). Where a contract contains a mix of sales and services, the UCC applies if the sale of goods is the dominant factor or "essence" of the transaction. *Freeman v. Shannon Constr., Inc.*, 560 S.W.2d 732, 738 (Tex.Civ.App.1977, writ ref'd n.r.e.). Although WesTech's original proposal of June 30, 1987, included some service trips for inspection, startup, instruction of plant personnel, and observation, the contract was predominantly for the supply of equipment. The later communications from WesTech specifically noted that most service items would be in addition to the contract price. Accordingly, the UCC applies to this transaction. *See Custom Controls Co. v. Ranger Ins.*, 652

S.W.2d 449, 452 (Tex.App.1983, no writ) (custom manufactured wellhead control panels are "goods" for purposes of UCC); *see also Mace Indust. v. Paddock Pool Equip. Co.*, 288 S.C. 65, 339 S.E.2d 527, 529 (Ct.App.1986) (applying UCC to sale of wastewater treatment equipment).

*Contract Formation*

In its first two points of error, WesTech challenges the legal and factual sufficiency of the evidence to support:

▲ Finding of fact no. 15: "On or about October 12, 1987, Clearwater sent WesTech a Purchase Agreement (the "Contract") to document the parties' agreement"; and

▲ Related findings of fact nos. 16, 17, 25, 28, 41, 42 and 44, regarding specific dates and terms of the contract.

We note that WesTech does not deny that the parties had an agreement; rather, the dispute centers on which document or documents supply the terms of their agreement. We understand WesTech's argument to be that the evidence adduced not only fails to support finding of fact no. 15, but also dictates a contrary finding. We disagree.

This exchange of documents between the parties gives rise to a classic battle of the forms. *See* § 2.207; *see also* James J. White and Robert S. Summers, *Uniform Commercial Code*, § 1–3, at 28–49 (3rd ed. 1988) (analyzing applicability of Uniform Commercial Code § 2–207 to agreements reached through battles-of-the-forms). We begin by reviewing the exchanges and documents involved in the formation of this commercial agreement:

| Date | Transaction |
| --- | --- |
| 06/30/87 | WesTech sends Clearwater original bid proposal to supply clarifiers and DAF. Clearwater uses WesTech's figures in submitting its bid to City. |
| 08/21/87 | Clearwater selected as general contractor. |
| 09/15/87 | Clearwater sends WesTech a letter of intent to contract. |
| 10/12/87 | Clearwater sends unsigned purchase agreement to WesTech containing new terms and different terms. |

**2.** Unless otherwise noted, all statutory cites are to this Act.

12/16/87 WesTech signs purchase agreement and returns it to Clearwater, objecting to certain terms and requiring that its bid proposal be incorporated into the agreement.

12/18/87 Effective date of Clearwater's signing purchase agreement.

02/12/88 Clearwater mails signed purchase agreement to WesTech.

---

WesTech's original proposal to Clearwater dated June 30th contained four sections: (1) a four-page list detailing the equipment WesTech proposed to furnish for the project; (2) a boiler-plate form entitled "General Terms and Conditions;" (3) an additional preprinted list of conditions entitled "specifications-escalation;" and (4) a boiler-plate warranty.

Clearwater used WesTech's figures in submitting its bid to the City; it sent Wes-Tech a letter of intent to contract on September 15th. On October 12th, Clearwater forwarded to WesTech Clearwater's unsigned printed form entitled "Standard Purchase Agreement (Order)," which contained typed-in details particular to this transaction. WesTech signed and returned the purchase agreement, along with a three-page letter from Russ Wright, Wes-Tech's group leader for the project, asking that WesTech's original bid proposal be incorporated into the purchase agreement and outlining several "items of difference." A Clearwater representative placed the purchase agreement and attached letter in his desk drawer for nearly two months. After the problems with the clarifiers arose, Clearwater finally sent the signed agreement to WesTech on February 12, 1988, agreeing to the suggested price increase but ignoring all other comments in Wright's letter.

In finding of fact no. 15, the court found that Clearwater sent WesTech a purchase agreement (the "contract") on October 12, 1987, to document the parties' agreement. WesTech argues that the unsigned purchase agreement of October 12, 1987, cannot be the contract because it contained terms that conflicted with the original bid proposal. Further, WesTech insists that it signed the purchase agreement on the express condition that the terms of Wes-Tech's original bid be made a part of the agreement. Clearwater replies that the evidence supports the trial court's finding that the purchase agreement Clearwater sent to WesTech does document the parties' agreement. Clearwater notes that the trial court did not state that the purchase agreement embodied the exclusive terms of the contract, but merely found that it documented the parties' agreement.

One policy goal of the UCC is to liberalize the formation of contracts so that the parties' intentions are not frustrated by the difficulties of fitting a transaction into the traditional common-law model of offer and acceptance. *See* §§ 2.204, 2.206, and cmts.; Caroline N. Brown, *Restoring Peace in the Battle of the Forms: A Framework for Making Uniform Commercial Code Section 2–207 Work*, 69 N.C.L.Rev. 893, 899 (1991). To that end the UCC directs that "an offer to make a contract shall be construed as inviting acceptance in any manner and by any medium reasonable in the circumstances." § 2.206(a)(1).

▐ It is clear that Clearwater accepted WesTech's offer to supply wastewater equipment for the expansion of the Walnut Creek facility, either by use of WesTech's figures in submitting its bid to the City, by giving notice of its intent to contract with WesTech, or by sending its purchase agreement to WesTech. It does not matter that the purchase agreement contained additional or different terms:

(a) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made condi-

tional on assent to the additional or different terms.

§ 2.207(a). There is nothing in the purchase agreement that expressly required WesTech to assent to its additional or different terms. We therefore treat Clearwater as having accepted WesTech's offer and turn to the provisions of § 2.207(b) to determine whether the terms of the purchase agreement became a part of the parties' agreement:

> (b) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:
>
> (1) the offer expressly limits acceptance to the terms of the offer;
>
> (2) they materially alter it: or
>
> (3) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

§ 2.207(b).

■ We begin with the statutory assumption that in this commercial transaction Clearwater's additional terms became part of the contract unless WesTech's bid proposal expressly limited the term of acceptance, the additional terms materially altered the parties' agreement, or WesTech objected within a reasonable time. WesTech's bid proposal did not expressly limit acceptance to its precise terms and nothing in the purchase agreement could be said to materially alter the parties' agreement.[3] *See* § 2.207 cmts 4 and 5.

■ This transaction does not involve the sending of conflicting printed forms with no other communications. WesTech signed and returned Clearwater's purchase agreement, and indicated its agreement in Russ Wright's letter of December 16, 1987:

> Thank you for your purchase order on the above referenced project. I apologize for the lateness of my formal response. We appreciate the opportunity of doing business with you and know that you will be pleased with our equipment. Enclosed are the signed copies of your order. . . .

The next paragraph of Wright's letter sets forth WesTech's objections to certain additional and different terms contained in Clearwater's purchase agreement:

> In reviewing your purchase order, there are a few items which need further clarification. We quoted this equipment through our sales representative based on our proposal number 87314. This shall be made a part of the order. *Any items of difference are addressed below.*

(Emphasis added). There follows a list of differences relating to pricing, submittals, shipment, terms of payment, specifications, items of service not included in the contract, and some miscellaneous provisions.

We understand WesTech to argue that by incorporating its original bid proposal in the parties' agreement it effectively "knocked out" all additional or different terms contained in Clearwater's purchase agreement. To adopt this argument we would have to ignore § 2.207(b) and Wright's letter, which we decline to do. Rather, we believe Wright's letter, and WesTech's signing of the purchase agreement, amounted to an acceptance of all of the terms of the purchase agreement except those items of difference specifically noted in Wright's letter.

Section 2.207 generally applies to agreements in which at least one party's printed form plays a role. Brown, *supra*, at 899–901. This section furthers the Code's goal of promoting the formation of contracts by adding a presumption that the printed form will not always be read. "The obvious utility of preprinted forms rests in part upon their customary use without being read by either party. . . . The customary failure to read forms is the very reality

---

**3.** "Assuming that the transaction is between merchants and that there is nothing communicated by the offeror triggering (2)(a) or (2)(c), the offeree's additional terms ordinarily should become part of the contract. The offeree's burden under this analysis is a light one indeed: all that the offeree must do in such a case to negate 'material alteration' is to establish that the term is common enough in the industry or in transactions between the two parties to negate the possibility of the offeror's surprise. . . ." Brown, *supra*, at 936.

intentionally accommodated by section 2–207." *Id.* at 938.

Knowing that when both parties use printed forms, the offer and acceptance are likely to contain conflicting terms, the drafters of section 2.207(b) offer a mechanism for ascertaining the parties' intentions in a commercial context:

> The drafters apparently believed that if the time and money spent in the drafting of preprinted forms for use in modern commerce were not to be wasted, the forms' preprinted terms must be given *some* effect. But they seem to have recognized as well that it is pure fantasy to construct a theory of effectiveness based on the presumption that the forms will be read. It might be so, but the likelihood is very small. Consequently, the significance of a simple exchange of forms (or an exchange of forms coupled with performance) must be determined in large part by rather mechanical rules derived from the drafters' presumption of what the parties expected based on their reading only the filled-in terms."

*Id.* at 904. (Emphasis in original).

 In ascertaining the parties' intentions, the "filled-in" terms are to be given more weight than preprinted terms. "Not being part of the preprinted verbiage, the filled-in terms reflect not only a high degree of importance attached to them by the offeree, but also the term's particular applicability to the specific agreement." *Id.* at 912. Wright's letter represented important "filled-in" terms particular to this agreement. We conclude that the specific terms of the typewritten letter should prevail over the general printed terms of the original bid proposal. The request that the bid proposal be incorporated into the agreement did not nullify Wright's acceptance of the terms of the purchase agreement, subject only to the items of difference specified in his letter. We would hold that Wright's letter must also be considered part of the parties' agreement, but because we do not read the trial court's finding of fact to establish the purchase agreement as the *exclusive* documentation of the parties' agreement, we find sufficient evidence in

the record to defeat both the no-evidence and the sufficiency-of-the-evidence challenges to finding of fact no. 15. We overrule point of error one.

There is evidence in the record sufficient to defeat the no-evidence challenge to findings of fact nos. 16, 17, 25, 28, 41, 42 and 44. We find conflicting evidence in the record regarding the dates on which Clearwater actually signed the purchase agreement and the dates for WesTech's submittals and delivery of the equipment. However, credibility choices are left to the trial court. *Great American Ins. Co. v. Murray,* 437 S.W.2d 264, 266 (Tex.1969). Further, we cannot say that these findings are so against the overwhelming weight of the evidence as to be manifestly unjust, and we therefore overrule the sufficiency of the evidence challenges to findings of fact nos. 16, 17, 41, 42, and 44.

 To support our conclusion that findings of fact nos. 25 and 28 find sufficient support in the evidence, we return to our previous discussion of how section 2.207(b) treats the terms of Clearwater's purchase agreement in this transaction. These two findings of fact both look to the purchase agreement (1) to hold WesTech liable for providing clarifiers and a DAF that meet the specifications set forth in the contract between Clearwater and the City, and (2) to hold WesTech liable for Clearwater's inability to perform timely under its contract with the City if Clearwater's failure is attributable to WesTech's failure to perform.

WesTech relies on the following provision in its bid proposal to ask us to overturn this finding of fact:

> PARTIES TO CONTRACT: WesTech Engineering Inc. is not a party to or bound by the terms of any contract between WesTech's customer and any other party. WesTech's undertaking are limited to those defined in the contract between WesTech and its direct customers.

Clearwater relies on the following provisions in its purchase agreement to sustain the court's findings:

[Preprinted] THE VENDOR [WesTech] AGREES TO FURNISH, SUPPLY AND DELIVER THE GOODS AND/OR SERVICES DESCRIBED BELOW IN COMPLETE ACCORDANCE WITH THE GOVERNING CONTRACT DOCUMENTS, INCLUDING ANY ADDENDA OR AMENDMENTS THERETO, FOR THE VENDEE'S [Clearwater's] USE AND/OR INCORPORATION IN THE ABOVE CAPTIONED PROJECT, TO WIT:

[Typed] "Furnish a complete job of all final clarifier equipment and dissolved air flotation sludge thickening system equipment as required by the plans and specifications, including Addenda numbers 1, 2, 3, and 4."

[Preprinted] STANDARDS CONDITIONS. IN ADDITION TO THE FOREGOING PROVISIONS THE PARTIES HERETO ALSO AGREE AS FOLLOWS:

[Typed] 13. In general, and subject only to the provisions hereof, the vendor shall be bound to the vendee by the same terms and conditions by which the vendee is bound to the owner. . . .

[Typed] 14. Vendor acknowledges that he has familiarized himself with all of the conditions of the locality, project, plans and specifications and any other factor or circumstance which may affect his performance under this agreement, and nothing in this agreement shall obligate or render the vendee liable for additional payment to the vendor on account of his misunderstanding or failure to familiarize himself with such factors and conditions.

To decipher the parties' intentions from the conflicting terms, we give more weight to the "filled-in" terms than to the preprinted terms. We conclude that when WesTech signed the purchase agreement it consented to Clearwater's "filled-in" terms unless Wright specifically excepted to them in his letter. Wright addressed specifications twice in his letter. Discussing submittals, he said, "We are waiting for a complete set of plans and specifications that should be on the way to us, as we have discovered that we need more complete information to properly complete the submittal." Discuss-

ing specifications, he said, "WesTech quoted standard equipment for this project, with modifications to match the specifications. Minor deviations may be taken during the submittal process which make the equipment equal to or superior to that specified." Neither of these statements can be reasonably interpreted as putting Clearwater on notice that WesTech did not consider itself obligated to supply equipment that met the specifications of the contract documents or otherwise bound to Clearwater on the same terms and conditions by which Clearwater was bound to the City. We then conclude that the evidence supporting findings of fact nos. 25 and 28, interpreted in light of section 2.207(b), defeats a no-evidence challenge and is not so weak that it fails to support the findings. We overrule point of error two.

*Condition Precedent*

In its third point of error WesTech raises no-evidence and insufficient-evidence challenges to finding of fact no. 84: "All conditions precedent to Westech's right and liability to perform under the contract were met." WesTech contends that CDM's approval of its design submittal was a condition precedent to WesTech's performance. We disagree.

Conditions precedent are generally disfavored in Texas:

> In construing a contract, forfeiture by finding a condition precedent is to be avoided when another reasonable reading of the contract is possible. . . . When the intent of the parties is doubtful or when a condition would impose an absurd or impossible result, the agreement will be interpreted as creating a covenant rather than a condition. . . .

*Criswell v. European Crossroads S. Ctr.*, 792 S.W.2d 945, 948 (Tex.1990) (citations omitted). The evidence supports the trial court's finding that WesTech unconditionally promised to supply wastewater equipment that met the specifications of the project documents. The project engineer's approval was not a condition precedent to WesTech's performance; rather, WesTech

breached its covenant to supply DAF equipment and clarifiers that met the contract specifications. The evidence in the record defeats both a legal- and factual-sufficiency challenge. We overrule WesTech's third point of error. We likewise overrule related points of error nineteen and twenty challenging the court's findings that WesTech's bid offered to supply equipment that would meet the plans and specifications in Clearwater's contract with the City.

*Impossibility of Performance*

■ The Uniform Commercial Code provides that a party to a contract may be excused from performance because of an unforeseen supervening circumstance not within the contemplation of the parties at the time of contracting. § 2.615, Cmt. 1. At trial, WesTech unsuccessfully argued that it was excused from complying with the contract due to impossibility of performance. In point of error eight, WesTech challenges, as against the great weight and preponderance of the evidence, finding of fact no. 85 that WesTech is not excused from liability because of impossibility of performance. Point of error ten challenges as erroneous the court's conclusion of law no. 21 that WesTech is not excused for impossibility of performance, arguing that this conclusion is based upon findings that are against the great weight and preponderance of the evidence. Again, we disagree.

WesTech contends that it should be excused from performance because it could not anticipate that CDM would interpret the contract specifications so strictly. Comments 4 and 8 to § 2.615 illustrate why WesTech does not escape from its contractual obligations under these circumstances. Comment 4 gives several examples of events that may excuse performance, such as a severe shortage of raw materials or supplies due to war, embargo, crop failure or unforeseen shutdown of major sources of supply. The standard contractual arrangement of submitting specifications to a project engineer is not contemplated as an impossibility. Further, comment 8 notes that the impossibility exception does not apply when the contingency in question is

"sufficiently foreshadowed at the time of contracting." WesTech knew from the beginning that its clarifier and DAF submittals were subject to approval by the project engineer. We therefore conclude that finding of fact no. 85 is not against the great weight and preponderance of the evidence and overrule the eighth point of error. We likewise find conclusion of law no. 21 to be supported by findings of fact that have evidentiary support in the record and overrule point of error ten.

*Challenges to the Project Engineer's Decisions Supporting Breach*

■ Having rejected WesTech's arguments that the engineer's approval was a condition precedent to WesTech's performance, and that performance was an impossibility for WesTech, we next consider all points of error challenging the project engineer's disapproval of WesTech's submittals. These challenged findings of fact are essential to support the court's conclusion that WesTech breached its covenant to supply wastewater equipment that met the project specifications. Because the project engineer's decision as to approval or disapproval of submittals is final, and because there is sufficient evidence in the record of CDM's disapproval of WesTech, we reject all of WesTech's challenges to the findings of fact and conclusions of law upholding CDM's decision that the WesTech equipment was not "equal" to the standards specified in the contract documents.

■ WesTech had pledged to supply its standard equipment with minor deviations to "make the equipment equal to or superior to that specified" (Wright's letter dated December 16, 1987). Specifically, WesTech complains that CDM applied the "or equal" provision too strictly in disqualifying its clarifiers. Where a contract specifies that a project engineer shall be the final arbitrator on disputed issues, the engineer's decision is final and conclusive unless she is guilty of fraud, misconduct or gross mistake:

When parties to a building contract agree to submit questions which may arise thereunder to the decision of the engineer, his decision is final and conclu-

sive; unless in making it he is guilty of fraud, misconduct, or such gross mistake as would imply bad faith or failure to exercise an honest judgment. . . .

*City of San Antonio v. McKenzie Constr. Co.*, 136 Tex. 315, 150 S.W.2d 989, 996 (1941); *Austin Bridge Co. v. State*, 550 S.W.2d 135, 137 (Tex.Civ.App.1977, writ ref. n.r.e.); *Plantation Foods, Inc. v. R.J. Reagan Company, Inc.*, 520 S.W.2d 432, 434 (Tex.Civ.App.1975, writ ref'd n.r.e.). Even if WesTech may have anticipated a more lenient application of project standards by CDM's engineer, the engineer's decision to reject WesTech's equipment as nonconforming cannot be challenged simply because another engineer might have arrived at a different decision:

> [Her] decision cannot be set aside . . . simply by proving that some other engineer would have acted differently or given a different decision . . . [or] simply on a conflict of evidence as to what [s]he ought to have decided. This must be true, because any other rule would simply leave the matter open for a court or jury to substitute its judgment and discretion for the judgment and discretion of the engineer.

*McKenzie Constr. Co.*, 150 S.W.2d at 996.

WesTech does not allege, nor does the record reveal, any fraud, misconduct, or gross mistake implying bad faith on CDM's part. The evidence supports and does not preponderate against the findings of fact upholding the decisions of the project engineer. And we find no errors in the complained-of conclusions of law that WesTech breached its agreement by not supplying equipment that satisfied the project specifications as CDM interpreted and applied those specifications.

We overrule the ninth point of error that there is no evidence or insufficient evidence to support finding of fact no. 68 that WesTech's proposed gears did not meet project specifications. For the same reason we overrule the fifteenth and sixteenth points of error challenging the evidence to support findings of fact nos. 37 and 39 that the project engineer properly investigated and properly rejected WesTech's experience involving DAF's.

We overrule point of error thirteen challenging as against the great weight and preponderance of the evidence finding of fact no. 66 that the project engineer acted reasonably and prudently in reviewing WesTech's performance under the contract. Under existing case law, which affords almost total deference to the project engineer in such instances, the evidence supports the court's finding that the engineer's actions were prudent and reasonable.

In point of error fourteen, WesTech challenges finding of fact no. 35 that Clearwater did not unreasonably delay its efforts to have WesTech approved by the project engineer. The evidence in the record supports the finding that Clearwater's efforts to secure WesTech's approval were reasonable, and we cannot say that this finding is so clearly against the great weight and preponderance of the evidence as to constitute a manifest injustice. We overrule point of error fourteen.

■ Similarly, we find evidence in the record supporting the court's finding that Clearwater was not arbitrary or unreasonable in failing to obtain all the details of the engineer's decision to reject the WesTech clarifiers and did not wrongfully terminate WesTech's opportunity to supply the clarifiers. WesTech was charged with meeting all of the specifications; failure of its equipment to meet even one specification warrants rejection. Further, the rejection of the WesTech clarifiers came after numerous resubmittals and working conferences had been conducted with the goal of obtaining equipment approval. We cannot say that this finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong. We therefore overrule point of error eleven.

■ We also overrule point of error twelve, challenging the court's finding that WesTech refused to submit other final clarifier equipment in a timely manner. The expansion project was predicated on a particular timetable; the evidence was that the rejection of the initial clarifier submittals,

as well as of the resubmittals, delayed this timetable. Evidence exists in the record to support this finding; thus WesTech's no-evidence challenge fails. And after considering all the evidence, we cannot say that this evidence, standing alone, is too weak to support the finding or that this finding is manifestly wrong or unjust.

Finally, WesTech brings a sufficiency challenge to finding of fact no. 78, that WesTech breached its contract by failing to supply equipment under the contract's terms and conditions. Having determined that WesTech promised to meet the project specifications in the contract documents, and having overruled all challenges to the decisions of the project engineer, we find sufficient evidence to support the court's finding of WesTech's breach and to rebuff a no-evidence challenge. Further, we cannot say that this evidence is too weak to support this finding or that the finding is so against the overwhelming weight of the evidence as to be manifestly unjust. We overrule the fourth and seventh points of error. We likewise overrule points of error nos. five, six, and twenty-two, finding no error in the trial court's conclusion of law no. 3 that WesTech breached its contract with Clearwater by failing to supply clarifiers and DAF equipment that met contract specifications.

## Promissory Estoppel

In point of error twenty-one, WesTech argues that the trial court erred in alternatively imposing liability under the doctrine of promissory estoppel. We believe that under the terms of the UCC a contract was formed between WesTech and Clearwater, and we have upheld the trial court's conclusion of law no. 1 to that effect. However, we find no error in the trial court's alternative theory of liability under the doctrine of promissory estoppel. There is testimony from Russ Wright that WesTech understood that Clearwater was seeking bids that would comply with the City's plans and specifications for expansion of the Walnut Creek facility. Two witnesses for Clearwater testified that Clearwater relied on WesTech's bid in formulating and submitting its bid to the City.

Clearwater provided further testimony that it relied upon the provision that WesTech's equipment would be equal to project specifications. We find no error in the court's conclusion of law no. 4 and overrule point of error twenty-one.

## Mitigation of Damages

In points of error seventeen and eighteen, WesTech contends that Clearwater failed to mitigate its damages by not requesting a change order from the City. It argues that Clearwater could have avoided all its extra costs in purchasing the equipment from other suppliers by insisting upon a change order to the City contract. WesTech relies on the following language in the City contract, which provides that

[i]f the Engineer/Architect requires a change of any proposed Subcontractor ... previously accepted by them, the Contract amount shall be increased or decreased by the difference in cost occasioned by such change and the appropriate change order shall be issued....

WesTech's reliance on this language is unpersuasive. First, the provision allows for a change order only if the Engineer/Architect has "previously accepted" the subcontractor. CDM never accepted WesTech's clarifiers or DAF equipment. Second, Mr. Rajandra Bhattarai, a City of Austin engineer, testified that the City would not have granted a change order where a proposed subcontractor is removed for failure to perform. The logic of WesTech's position is unpersuasive in the context of commercial-construction contracts. Any increased costs resulting from the default of a subcontractor should be absorbed by the general contractor, not the owner. We do not interpret the language relied on by WesTech to force the City to pay for the increased costs when a subcontractor defaults.

The testimony supports the trial court's finding of fact no. 83 that Clearwater mitigated its damages, and we reject WesTech's challenge to the evidence supporting this finding. We reject as well WesTech's complaint that the trial court improperly

concluded that Clearwater mitigated its damages. Points of error seventeen and eighteen are overruled.

*Attorney's Fees*

 In its final point of error, WesTech complains of the trial court's award of attorney's fees on appeal without conditioning the award on Clearwater's success on appeal. Clearwater attempts to rely on the parties' stipulation as to the amount of attorney's fees, which did not condition that amount on the success of an appeal. We agree with WesTech that any award of attorney's fees on appeal must be conditioned on the receiving party's success. *Smith v. Smith*, 757 S.W.2d 422, 426 (Tex. Ap.1988, writ denied); *Siegler v. Williams*, 658 S.W.2d 236, 241 (Tex.App.1983, no writ). We sustain appellant's twenty-third point of error that an unconditional award of attorney's fees is erroneous as a matter of law. This error does not require reversal, however. Rather, we modify the trial court's judgment to condition the award of attorney's fees on appeal to Clearwater's success on appeal. *See CPS Int'l. v. Harris & Westmoreland*, 784 S.W.2d 538, 544 (Tex.App.1990, no writ).

*Cross–Points*

Clearwater asserts two cross-points of error complaining of the trial court's failure to grant Clearwater consequential damages and certain expenses related to the prosecution of its claim.

In its first cross-point, Clearwater contends that because of WesTech's breach, Clearwater was forced to schedule a construction crane for an additional two months. Crane rental expenses and related insurance, operator labor, fuel oil and maintenance and extended overhead expenses amounted to $60,095.

 Damages may be recovered when "loss is the natural, probable, and foreseeable consequence of the defendant's conduct." *Mead v. Johnson Group, Inc.*, 615 S.W.2d 685, 687 (Tex.1981) (citing *Hadley v. Baxendale*, 9 Exch. 341, 354 (1854)). Further, speculative or remote damages may not be recovered. *A.B.F. Freight Sys. v. Austrian Import*, 798 S.W.2d 606, 615 (Tex.App.1990, writ denied); *Roberts v. U.S. Home Corp.*, 694 S.W.2d 129, 135 (Tex.App.1985, no writ).

 Three witnesses for Clearwater testified as to damages: Rick Minks, Clearwater's superintendent; Steve Carrico, comptroller at Phelps, Inc., Clearwater's corporate parent; and Lance Johnson, area manager for Clearwater. Minks testified that in his opinion, although the crane and crew did not sit idle, there was a loss of efficiency in moving the equipment around to make use of it. However, he was unable to give any specific examples of the crane's idleness or of increased overhead costs directly attributable to WesTech's failure to supply the clarifiers. Further, there were no notations in project logs indicating inefficiencies or improper use of the cranes. Carrico gave detailed testimony on the rental and insurance expenses for two months of crane rental. Johnson also gave evidence, but could not present any specific examples of consequential damages.

We find Minks's testimony the most persuasive. Clearwater probably did incur increased costs due to a loss of efficiency in the use of its crews. As his testimony shows, orderly scheduling of construction crews is essential for efficient utilization. Having recognized this, however, none of Clearwater's witnesses were able to tie specific additional expenses to WesTech's breach of contract. Therefore, the trial court correctly denied consequential damages. To award damages based on the evidence provided would be to speculate on their amount. We overrule appellee's first cross-point.

 Clearwater's second point of error is that it is entitled to recover $7,269 in expenses related to the prosecution of its claim. Section nine of the purchase agreement provides in part:

In any determination of damages directly attributed to failure or deficiency in the performance of the vendor, it is agreed that vendee shall recover all damages it may sustain, as well as *all costs* and attorney fees which may arise from the

enforcement of any suit for damages under this agreement.

(Emphasis added).

WesTech relies on language in the General Terms and Conditions of its original bid proposal stating, "WesTech shall not be liable for any contingent, incidental or consequential damages for any reason whatever." We note, however, that Wright's letter of December 16, 1987, did not object to consequential damages as an item of difference. We therefore hold that the terms of the purchase agreement, not WesTech's General Terms and Conditions, control the determination of this issue.

 We are not persuaded, however, that the purchase-agreement provisions encompass the costs Clearwater is seeking to recover. "Costs" generally do not include costs billed to the client as part of the attorney's fee for services provided. Rather, costs usually refer to "[f]ees and charges required by law to be paid to the courts or some of their officers, the amount of which is fixed by statute or the court's rules; e.g. filing and service fees." Black's Law Dictionary, p. 312 (5th ed. 1979). We find no error in the court's decision to deny appellee's requested litigation expenses which do not comport with the traditional definition of costs. We overrule the second cross-point.

## CONCLUSION

We sustain appellant's twenty-third point complaining of the trial court's unconditional award of attorney's fees and modify the judgment to reflect an award of such fees only upon success on appeal. As modified, we affirm the judgment of the district court.

POWERS, J., did not participate.