TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-00-00686-CV






Linda Carol Nesmith, Appellant



v.


 

Brian B. Berger, Appellee






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 200TH JUDICIAL DISTRICT


NO. 97-03085, HONORABLE W. JEANNE MEURER, JUDGE PRESIDING 







 This appeal involves the dissolution of Linda Nesmith's marriage to Brian Berger,
a marriage of less than five years that was filled with financial negotiations and contractual
arrangements. The sole dispute regards Nesmith's interest in the marital residence on Hedge Lane
in Austin. To address this issue, the trial court was required to review a premarital "agreement to
agree," a postnuptial agreement, the real estate documents surrounding the purchase of the home as
Berger's separate property, a second deed from Berger conveying the property to both Berger and
Nesmith in undivided interests, and an executed "buy-in" agreement with a subsequent addendum
attempting to define the parties' joint ownership interests in the residence following the second deed.

 The trial court awarded Nesmith $50,882 in lieu of her interest in the Hedge Lane
property. Dissatisfied with this award, Nesmith attacks the postnuptial contract as unenforceable,
complains that the trial court improperly divested her of separate property when it should have
ordered a partition sale of the property, and improperly considered Nesmith's failure to pay her share
of residential obligations after separation when the court granted exclusive possession of the home
to Berger. After reviewing all of the real estate documents and agreements of the parties and
considering which issues were preserved at trial, we hold that the trial court did not abuse its
discretion in awarding Nesmith $50,882 in lieu of her interest in the marital residence. 


FACTUAL AND PROCEDURAL BACKGROUND

 Both parties desired a prenuptial agreement. When they were unable to agree on the
terms before the wedding, they agreed that they would execute a postnuptial agreement, which they
did. This marital agreement provided that all income earned by either spouse or from either spouse's
separate property would remain that party's separate property. The marital agreement further
provided that the spouses would contribute to joint living expenses roughly in proportion to their
earnings, as reflected on the separate income tax returns they agreed to file annually. 

 Each party owned a residence before marriage. Berger used the proceeds from the
sale of his former residence to buy the Hedge Lane house that became the marital residence. The
deed recited that title to the house was taken as his separate property and he alone signed the
mortgage. When Nesmith sold her former residence, she "bought in" to the marital residence to
escape capital gains taxes. There was a second deed from Berger as grantor conveying the property
to husband and wife in undivided interests. This was followed by two agreements attempting to
define the parties' joint ownership in the property. The first, signed the same day as the second deed,
reflected that Nesmith paid approximately thirty percent of the down payment contributed by Berger,
would receive a thirty-percent interest in the Hedge Lane property, and would be responsible for
thirty percent of the mortgage and taxes, as between the parties. (1) Nesmith alone signed an addendum
about two months later detailing her contributions and providing that the parties would make pro rata
contributions to the expenses of Hedge Lane, in accordance with the marital agreement. 


DISCUSSION

I. Validity of the Postnuptial Agreement

 Nesmith first complains on appeal that the postnuptial agreement was not valid and
enforceable because she did not sign it voluntarily. The agreement was the result of lengthy
negotiations that started shortly after Nesmith and Berger became engaged in 1991. Nesmith had
been married three times before and had no children. Berger's first marriage ended in a bitter
divorce, which came before this Court in 1992. (2) Evidence at trial indicated that Nesmith wanted an
agreement to protect her property from Berger's ex-wife or any claims by the children of that
marriage.

 In early 1992, Berger and Nesmith began negotiating a premarital agreement. Relying
on a "prenuptial agreement kit," Nesmith and Berger drafted at least seven versions of an agreement. (3)
The parties could not agree, however, on a final version before the wedding, so they entered a
handwritten premarital agreement stating that "[i]t is our intention to have a post-nuptial agreement
completed by June 12th." They married on May 16, 1992.

 On May 18, Berger gave Nesmith a letter he wrote prior to the wedding, expressing
concern that Nesmith had not yet signed an agreement. In the letter Berger questioned Nesmith's
faith and trust in him. He wrote, "I believe I have extended all the trust I can and now it is up to you
to show some courage and reciprocate. June 12th is a firm deadline in my mind and will mark a
turning point in our relationship." Nesmith testified that Berger did not come home on May 19 or
20, and that on May 21, "he came home and said, I am not going on our honeymoon until you sign
something."

 On May 21, both Nesmith and Berger signed a typewritten postnuptial agreement
entitled "Marital Contract." Both signatures were notarized, although Nesmith testified that she did
not sign in the presence of a notary and that Berger took the document after she had signed it to be
notarized by his receptionist. The postnuptial agreement refers to twelve appendices, not all of
which appear in the record. Berger testified that at the time the parties signed the agreement all of
the appendices were attached. Nesmith testified, however, that she never saw the document with all
of the appendices attached.

 After the honeymoon, both parties followed the terms of the postnuptial agreement. 
Nesmith testified that she and Berger complied with the agreement with regard to sharing expenses. 
She explained that each year they filed separate tax returns reflecting their own earnings and used
these tax returns from the previous year to calculate the percentages each would contribute for
common living expenses in the coming year.

 The trial court made a finding of fact that the parties entered into a valid, enforceable,
and binding postnuptial agreement on May 21, 1992. Nesmith challenges this finding, arguing that
Berger pressured her to sign an agreement she thought was invalid by threatening not to go on the
honeymoon.

 Family Code section 4.105(a)(1) provides that a partition or exchange agreement
between spouses is not enforceable against a party if that party did not sign the agreement
voluntarily. Tex. Fam. Code Ann. § 4.105(a)(1) (West 1998). Nesmith urges that "voluntarily"
means that an action is taken by design, intentionally, purposely, by choice, of one's own accord, or
by the free exercise of will. See Prigmore v. Hardware Mut. Ins. Co. of Minn., 225 S.W.2d 897, 899
(Tex. Civ. App.--Amarillo 1949, no writ).

 The burden of proof is on the person attempting to prove that the agreement was not
signed voluntarily. Tex. Fam. Code Ann. § 4.105(a)(1); Matelski v. Matelski, 840 S.W.2d 124, 128
(Tex. App.--Fort Worth 1992, no writ). Findings of fact are reviewed for legal and factual
sufficiency of evidence. Westech Eng'g, Inc. v. Clearwater Constructors, Inc., 835 S.W.2d 190, 195
(Tex. App.--Austin 1992, no writ). When the legal sufficiency of a fact finding is challenged by the
party who had the burden of proof on that issue at trial, we first examine the evidence that supports
the finding and ignore all evidence to the contrary. Sterner v. Marathon Oil Co., 767 S.W.2d 686,
690 (Tex. 1989). Then, if there is no evidence to support the fact finding, we must examine the
entire record to see if the contrary position is established as a matter of law. Id. In reviewing a
finding for factual sufficiency, we must consider and weigh all the evidence. Matelski, 840 S.W.2d
at 128. If the trial court's finding is so contrary to the great weight and preponderance of the
evidence as to be manifestly unjust, the challenge should be sustained, even if there is some evidence
to support the fact-finding. Id. at 128-29.

 In Matelski, the husband urged that he had not voluntarily signed a postnuptial
agreement, relying on the predecessor to Family Code section 4.105. The court of appeals
interpreted his argument as a claim of duress. The court explained that "[t]here can be no duress
unless there is a threat to do some act which the party threatening has no legal right to do." Id. at
129. A threat rises to the level of duress when it destroys the free agency of the party to whom it is
directed. Id. The threatened action must be imminent, and the person to whom it was directed must
have no present means of protection. Id.

 The only threat Nesmith contends Berger made was his statement that he would not
go on the honeymoon unless she signed the agreement. Berger was not threatening to take an action
he had no legal right to take. See id. Indeed, he could have refused to go on the honeymoon and
suffered no legal recourse. Such a threat does not amount to duress and Nesmith cannot successfully
argue that she lacked free will in signing the agreement.

 Nesmith next claims that the agreement she signed did not have the appendices
attached, which were meant to be an integral part of the agreement. She posits that because those
items were missing, the contract was invalid because as long as negotiations are incomplete, there
is no contract. See Brillhart v. Beever, 198 S.W. 973, 975 (Tex. Civ. App.--Amarillo 1917, no
writ). She urges that for an agreement to be finally settled, it must comprise all the terms that the
parties intended to introduce into the agreement. See id. Nesmith testified she never saw the
appendices attached, while Berger told the court that the document was complete when they signed
it. Berger's testimony was legally sufficient to prove that the contract was complete. (4) Even looking
at the entire record on this point, including Nesmith's testimony, the fact-finding is not contrary to
the great weight and preponderance of the evidence. Indeed, Nesmith faithfully ratified the
agreement each year by performing according to its terms. We overrule Nesmith's first point of
error.


II. Partition of the Hedge Lane House

 Nesmith next complains that the trial court divested her of separate property by
awarding her a money judgment for the value of her interest in the Hedge Lane house rather than
ordering a partition sale of the property. In May 1993, Berger purchased the house on Hedge Lane. 
Berger paid the down payment from his separate property, and he alone signed the note for the
remainder of the purchase price.

 In September 1995, Nesmith and Berger executed a buy-in agreement, acknowledging
Nesmith's interest in the Hedge Lane house. This agreement states: "The home was purchased by
Brian as his separate property on 30 April 1993 for $611,429. Linda is purchasing a 30% share
effective 29 September 1995. Linda is purchasing this 30% share for $189,000 . . . . Linda assumes
30% liability for the note . . . as well as 30% of taxes owed . . . ." On the same day, Berger signed
a general warranty deed conveying the property to "Brian B. Berger and Linda Nesmith-Berger." 
This second deed provides that grantees do not "assume payment of the note or liability under any
instrument securing it." Although Nesmith was not liable to the lender on the mortgage, she
assumed liability to Berger for thirty percent of the mortgage payments and tax liability under the
buy-in agreement. On December 7, Nesmith signed an addendum to the buy-in agreement laying
out the details of her contributions. It provided that her initial buy-in was thirty percent of Berger's
down payment of $126,000, amounting to $37,800, made in the form of improvements and repairs
to the property. The addendum further provided that the parties would make pro rata contributions
to the expenses of the Hedge Lane house and that these would be used to maintain "a running record
of pro rata home equity."


A. Nesmith's Interest in the Property

 Nesmith challenges the trial court's finding of fact that Berger initially "acquired as
his sole and separate property a residence for the parties on Hedge Lane." She agrees that Berger
acquired part of the house as his separate property when he paid $126,000 from his separate funds
as a down payment. She alleges that because the note for the remainder of the purchase price was
made during the marriage, it was presumptively made on community credit, and the note failed to
specify that the lender agreed to look only to Berger's separate property for payment. See Sprick v.
Sprick, 25 S.W.3d 7, 13 (Tex. App.--El Paso 1999, pet. denied) ("[D]ebts contracted during the
marriage are presumed to be on the credit of the community and thus are community obligations,
unless it is shown that the creditor agreed to look solely to the separate estate of the contracting
spouse for satisfaction."). Therefore, she contends, the house was partly community property to the
extent of the community debt. See Gleich v. Bongio, 99 S.W.2d 881, 883 (Tex. 1937) ("[P]roperty
acquired on the credit of the community is community property."). This presumption must be
overcome by clear and convincing evidence. Tex. Fam. Code Ann. § 3.003(b) (West 1998); Sprick,
25 S.W.3d at 13.

 Nesmith cites Gleich for the proposition that their postnuptial agreement does not
affect the character of the property because the "mere intention of the husband and wife cannot
convert property purchased with an obligation binding upon the community into the separate estate
of either spouse." Gleich, 99 S.W.2d at 884. Gleich holds that to avoid creating community debt,
"the vendor must have agreed with the vendee to look only to his separate estate for the satisfaction
of the deferred payments." Id. Nesmith essentially contends that the mortgage signed by Berger
lacks the "magic words" stating that the creditor agreed to look solely to Berger's separate property
for satisfaction.

 A question of fact is raised as to the character of the property when the documentary
evidence fails to reflect an express agreement by the lender to look only to the purchasing spouse's
separate estate for payment. See Glover v. Henry, 749 S.W.2d 502, 503 (Tex. App.--Eastland 1988,
no writ). We must look to the totality of the circumstances in which the debt arose to determine the
character of the debt. Cockerham v. Cockerham, 527 S.W.2d 162, 171 (Tex. 1975). Evidence
showing, for example, that the down payment was paid with separate funds, and the parties agreed
that the property would remain separate property and the balance of the debt was to be paid from
separate funds is sufficient to overcome the presumption of community debt. Foster v. Christensen,
67 S.W.2d 246, 249 (Tex. Comm'n App. 1934, holding approved). "The effect of such proof would
not be altered by the fact that the [non-purchasing spouse] joined in the promise to pay the balance
of the purchase money." Id.

 Here, Nesmith herself sought to enter an agreement that maintained the status of her
separate property, including property acquired after marriage. The postnuptial agreement assured
that this purpose was achieved and that there would be no community income and essentially no
community property. As a result, a creditor would be unable to look to any community property for
satisfaction of the note because none existed. In addition, Berger alone signed the note, and Nesmith
signed the deed of trust "pro forma," which recited: "BRIAN B. BERGER AND LINDA C.
NESMITH, PRO FORMA FOR THE REASON THAT THE PROPERTY DESCRIBED HEREIN
IS THE SOLE AND SEPARATE PROPERTY OF BRIAN B. BERGER." We hold that these facts
are legally and factually sufficient to support the trial court's finding of fact that the Hedge Lane
house was initially acquired as Berger's sole and separate property. Under these circumstances,
Berger successfully defeated the presumption of community credit, even though the note lacked the
"magic words." We overrule Nesmith's second point of error. We next address how the buy-in
agreement and second deed affected the parties' interest in the Hedge Lane property.

 Berger asserts that we should view Nesmith's buy-in agreement as creating a
partnership. The untitled agreement reads: "This is to document the partnership agreement between
Brian B. Berger and Linda Nesmith Berger regarding their joint ownership of the residence at 9
Hedge Lane . . . ." (Emphasis added.) Nesmith responds that Berger did not argue a partnership
theory at trial, and therefore, he cannot raise it on appeal. See Carrizales v. Tex. Dep't of Protective
& Regulatory Servs., 5 S.W.3d 922, 925 (Tex. App.--Austin 1999, pet. denied). In our review of
the record, we find that Berger never asserted to the trial court that the property was owned by a
partnership. At best, he referred to the document as the "partnership agreement," but he did not
advance the legal argument he asserts here. The argument, therefore, is waived. See id.

 Even had he asserted a partnership theory to the trial court, the agreement did not
meet the requirements of establishing a partnership. See Tex. Rev. Civ. Stat. Ann. art. 6132b-2.03
(West Supp. 2001) ("Rules for Determining if Partnership is Created"). Article 6132b-2.03(b) lists
circumstances not indicating creation of a partnership, including joint ownership of property, which
is exactly what the buy-in agreement established. See id. art. 6132b-2.03(b)(2). A label used by lay
people does not define a partnership. Cf. id.

 The trial court found that the buy-in agreement and the addendum "concerning the
Hedge Lane residence . . . are valid and enforceable." In a separate finding of fact, the trial court
concluded that Nesmith "is entitled to receive from [Berger] the sum of $50,882 in lieu of her
interest in said property." The trial court did not characterize Nesmith's interest in the Hedge Lane
house as separate or community property. (5) In a conclusion of law, the trial court determined that the
award of $50,882 to Nesmith "does not constitute a divestiture of separate property."

 Nesmith attacks this conclusion of law, stating that the trial court divested her of her
separate property interest (6) in the house by awarding her a money judgment for the value in the house
and by not ordering the property sold. She cites to Eggemeyer v. Eggemeyer, 554 S.W.2d 137 (Tex.
1977), for the proposition that the trial court cannot divest her of her separate property interest. 
Eggemeyer holds that while a trial court has wide latitude in the division of community property, it
has no discretion to take the separate property of one spouse and donate it to the other. Id. at 142.

 Nesmith had the burden to prove by clear and convincing evidence that she held a
separate property interest in the Hedge Lane house. See Tex. Fam. Code Ann. § 3.003(b). To
discharge her burden, she was required to trace and clearly identify the separate funds used to
purchase her interest in the house. See Jones v. Jones, 890 S.W.2d 471, 475 (Tex. App.--Corpus
Christi 1994, writ denied). Nesmith presented no evidence tracing her separate funds, allegedly from
the sale of a former residence, into her later acquired interest in the residence. Instead, she directed
her efforts toward disputing Berger's separate property claim rather than proving her own.
Essentially, Nesmith argued that the postnuptial agreement was invalid and that Berger's efforts to
take title to the house as his separate property failed because the lender did not agree to look only
to his separate property. We have rejected both arguments, as did the trial court. In the alternative,
Nesmith claimed that half of the Hedge Lane house was her separate property by virtue of the deed
from Berger. This theory was not strongly urged to the trial court and Nesmith raises no issue on
appeal that the trial court failed to characterize her interest in the home as her separate property. 
Rather, Nesmith argues that the trial court divested her of her separate property by awarding her a
money judgment for her interest in the home. We reject this argument. To the extent that Nesmith
relies on the deed from Berger to her and Berger jointly, we hold that this deed during marriage,
which did not characterize Nesmith's jointly held interest as separate property, did not suffice to
create a separate property interest. Other than relying on the deed, Nesmith never attempted to trace
separate monies into her "purchase" of some interest in the home. Because she never met her burden
of proving her separate property interest in Hedge Lane, she cannot complain on appeal that the trial
court divested her of that interest. We uphold the trial court's conclusion that it did not divest
Nesmith of separate property by awarding her $50,882 in lieu of her interest in the residence.

 Furthermore, at the close of the trial, Nesmith never asked the court to partition the
Hedge Lane property. She cannot now complain on appeal that the trial court failed to partition the
property. Nesmith relies on the fact that she once filed a suit for partition and that somehow that suit
was consolidated with the divorce proceeding. Although Nesmith's attorney asserted in oral
argument to the trial court that he thought the two had been consolidated, we find in the record no
motion to consolidate the suit for partition with the suit for divorce. Assuming the two suits were
consolidated, however, Nesmith only asked the trial court to award her the monetary equivalent of
her equity interest in the residence. The dispute was about the size of her equity interest, not about
remedies. In her proposed disposition of the property, Nesmith asked for one-half of the equity in
the house. At the end of the trial, the judge asked Nesmith's counsel what remedy she sought if the
court upheld the postnuptial agreement. Nesmith's counsel answered that "we would have to say
that it's 30 percent to Linda Nesmith and 70 percent to Brian Berger." When asked about the value
of that percentage, counsel answered that it was worth $120,000. Counsel did not request a partition
of the real property or the appointment of a receiver. A party that asks for a certain type of relief
cannot complain on appeal if that relief is granted. Litton Indus. Prods., Inc. v. Gammage, 668
S.W.2d 319, 321-22 (Tex. 1984). Nesmith asked the trial court to award her equity based on her
percentage interest in the house; she did not request a partition when the trial court asked what
remedy she sought. That was the time to ask for partition of the property. Nesmith cannot now seek
a partition on appeal because she is unhappy with the amount of equity awarded by the trial court. 
See id. We overrule Nesmith's fourth point of error.


B. Deduction of mortgage and tax payments

 Finally, Nesmith complains that the trial court erred in deducting from her monetary
judgment thirty percent of the mortgage and tax payments that came due after Nesmith moved out
of the house. Nesmith could have argued that as a co-tenant she was entitled to an offset for her
constructive ouster from the property after the parties separated. Nesmith's counsel, however,
conceded at oral argument that this theory was never urged to the trial court. Nesmith, instead, refers
us to certain comments the judge made at the close of the trial to show that these deductions figured
into the trial court's calculation of the monetary award. 

 The trial judge made a finding of fact that Nesmith was "entitled to receive from
[Berger] the sum of $50,882 in lieu of her interest in said property." The supreme court has held that
an appellate court may not look to comments a judge makes at the conclusion of a bench trial as a
substitute for findings of fact and conclusions of law. In re W.E.R., 669 S.W.2d 716, 716 (Tex.
1984). Because we may not consider those comments apart from a finding of fact reflecting the
court's actual calculations, we are unable to address Nesmith's complaint regarding the deduction. 
We overrule the third point of error.


CONCLUSION

 We uphold the trial court's findings that the postnuptial agreement was valid and
enforceable and that the Hedge Lane property was initially held as Berger's separate property. We
affirm the conclusion that the monetary judgment awarded to Nesmith for her later-acquired equity
in that home did not constitute a divestment of her separate property. Based on the agreements of
the parties, we conclude that the trial court did not abuse its discretion in awarding Nesmith $50,882
in lieu of her interest in the marital residence. Therefore, we affirm the judgment of the trial court.



 

 Bea Ann Smith, Justice

Before Justices Kidd, B. A. Smith and Puryear

Affirmed

Filed: June 29, 2001

Publish


1. According to the second deed, Nesmith did "not assume payment of the note or liability
under any instrument securing it."
2. Berger v. Berger, No. 03-90-00093-CV (Tex. App.--Austin June 17, 1992) (not
designated for publication), rev'd, No. D-3153 (Tex. May 19, 1993) (not designated for publication),
1993 Tex. LEXIS 64. After much post-divorce wrangling, Berger terminated his parental rights to
the children from his first marriage.
3. Six preliminary versions of the agreement appear in the record, plus the final version.
4. Berger testified that Nesmith took the agreement with her when she left him and that it
was intact when she took it, but that it had been taken apart when she returned it during the divorce
proceedings.
5. This failure to characterize the property interest has not been challenged in the trial court
or on appeal.
6. Berger argues that Nesmith, under oath, testified at trial that the Hedge Lane property was
community property. He maintains that she cannot on appeal urge that she has a separate property
interest in the house. See Baptist Mem'l Hosp. Sys. v. Smith, 822 S.W.2d 67, 73 (Tex. App.--San
Antonio 1991, writ denied) (holding that a litigant cannot take one position in trial and an
inconsistent position on appeal). We refuse, however, to rely on a lay person's testimony on the
legal characterization of property to hold she waived argument as to other legal theories. In
Nesmith's proposed disposition of issues, Nesmith not only proposed a division of community
property, but she asked the trial court: "[I]n the event [the Hedge Lane house] is not found to be
community property, then one-half is my separate property by Deed from BRIAN B. BERGER." 
This is sufficient for Nesmith to urge on appeal that she has a separate property interest.


use. Nesmith could have argued that as a co-tenant she was entitled to an offset for her
constructive ouster from the property after the parties separated. Nesmith's counsel, however,
conceded at oral argument that this theory was never urged to the trial court. Nesmith, instead, refers
us to certain comments the judge made at the close of the trial to show that these deductions figured
into the trial court's calculation of the monetary award. 

 The trial judge made a finding of fact that Nesmith was "entitled to receive from
[Berger] the sum of $50,882 in lieu of her interest in said property." The supreme court has held that
an appellate court may not look to comments a judge makes at the conclusion of a bench trial as a
substitute for findings of fact and conclusions of law. In re W.E.R., 669 S.W.2d 716, 716 (Tex.
1984). Because we may not consid