In The
Court of Appeals
Sixth Appellate District of Texas at Texarkana

______________________________

No. 06-03-00026-CV
______________________________


FARMERS INSURANCE EXCHANGE, Appellant
Â 
V.
Â 
RICHARD K. NEAL, Appellee


Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 

On Appeal from the 76th Judicial District Court
Titus County, Texas
Trial Court No. 27202


Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 



Before Morriss, C.J., Ross and Carter, JJ.
Opinion by Chief Justice Morriss


O P I N I O N

Â Â Â Â Â Â Â Â Â Â Â Â This appeal turns on whether two race cars, and associated automobile parts, owned by
Richard K. Neal, were vehicles "used for recreational purposes" within the meaning of Neal's
standard homeowners insurance policy issued by Farmers Insurance Exchange (Farmers) or, more
precisely, whether there was sufficient evidence presented at trial that they were so used. Because
we find there is sufficient evidence supporting the trial court's judgment, we affirm. 
Background
Â Â Â Â Â Â Â Â Â Â Â Â During the time period 1992 to 1996, Neal purchased two race carsâa Boulton Supercomp
Dragster and a Don Davis Super Gas Roadster. The race cars were kept on Neal's residence premises
in a building used as a workshop, garage, and storage facility. In December 1996, the race cars were
destroyed when the building burned, leaving nothing of residual salvage value. Shortly after the fire,
Neal filed a claim under his homeowners insurance policy, and Farmers paid the portion of his claim
representing the building and some personal property. Farmers, however, refused to pay the
remainder of Neal's claim, arguing that the destroyed race cars and related components (e.g., a Barry
Grant fuel pump and Chuck Nuytten alcohol carburetor) were expressly excluded under Neal's
policy. Neal subsequently sued Farmers, seeking compensation for the loss of the disputed property
as well as for statutory penalties and cleanup and removal costs. Following a bench trial in October
2002, a Titus County trial court ruled in favor of Neal, ordering Farmers to pay $119,733.15.


 
Farmers now appeals, questioning the legal and factual sufficiency of the trial court's determination
that Neal's two race cars were covered under his homeowners insurance policy. 
Standard of Review
Â Â Â Â Â Â Â Â Â Â Â Â When reviewing a trial court's findings for legal and factual sufficiency, appellate courts
should apply the same standards that would be used in reviewing evidence supporting a jury's
findings. Catalina v. Blasdel, 881 S.W.2d 295, 297 (Tex. 1994). Recognizing that "findings of fact
issued in a bench trial have the same force and dignity as a jury's verdict," we note that the trial
court's findings "are not conclusive when there is a complete statement of facts in the record." 
Tucker v. Tucker, 908 S.W.2d 530, 532 (Tex. App.âSan Antonio 1995, writ denied). In such a
situation, appellate courts are not bound by the trial court's findings, id., but may overturn them only
if, after weighing all the evidence in the record, they "are so against the great weight and
preponderance of the evidence as to be clearly wrong and unjust." Ortiz v. Jones, 917 S.W.2d 770,
772 (Tex. 1996).
Â Â Â Â Â Â Â Â Â Â Â Â A trial court's conclusions of law are always reviewable. Westech Eng'g, Inc. v. Clearwater
Constructors, Inc., 835 S.W.2d 190, 196 (Tex. App.âAustin 1992, no writ). They "will be upheld
on appeal if the judgment can be sustained on any legal theory supported by the evidence" and,
unless erroneous as a matter of law, will not be reversed. Id. In conducting a de novo review,
appellate courts may reexamine for correctness legal conclusions drawn from specific findings of
fact contained in the record, id. at 196 & n.1, and exercise their own judgment on each issue,
affording no deference to the original tribunal's decision. Quick v. City of Austin, 7 S.W.3d 109, 116
(Tex. 1999).
Recreational Purposes?
Â Â Â Â Â Â Â Â Â Â Â Â To determine this coverage question, we must carefully examine the policy language
underlying the dispute. Insurance policies are contracts subject "to the same rules of construction
as other contracts," and "[o]ur primary goal, therefore, is to give effect to the written expression of
the parties' intent." Balandran v. Safeco Ins. Co. of Am., 972 S.W.2d 738, 740 (Tex. 1998). In
interpreting an insurance policy, it will be "construed liberally in favor of the insured and strictly
against the insurer, especially when . . . dealing with exceptions and limitations." Cont'l Cas. Co.
v. Fina Oil & Chem. Co., No. 01-02-00449-CV, 2003 Tex. App. LEXIS 5353 (Tex. App.âHouston
[1st Dist.] June 26, 2003, no pet.) (citing Gonzalez v. Mission Am. Ins. Co., 795 S.W.2d 734, 737
(Tex. 1990)).
Â Â Â Â Â Â Â Â Â Â Â Â Although Neal and Farmers agree that the contract language is unambiguous, each party
urges this Court to adopt a different interpretation. The policy itself expressly excludes from
coverage any "motor or engine propelled vehicles or machines designed for movement on land,
including attached machinery or equipment." As a limited exception to this provision, the policy
also provides coverage for certain vehicles that (1) "are not subject to motor vehicle registration" and
(2) are "vehicles or machines used for recreational purposes while located on the residence
premises." (Emphasis omitted.) Because there is no disagreement that Neal's race cars were not
subject to motor vehicle registration, the difference in the parties' interpretations results from the
wording of the exception's second element. Neal contends the policy covers vehicles used for
recreational purposes as long as they are on the premises at the time of the loss, while Farmers
contends the policy covers vehicles used for recreational purposes so long as such recreational use
occurs on the residence premises. After briefing the location issue in that fashion, Farmers conceded
at oral argument that otherwise covered vehicles do not become uncovered because their recreational
use occurs off premises. We agree, and now focus on the recreational component of the coverage
issue.
Â Â Â Â Â Â Â Â Â Â Â Â That parties may advance conflicting interpretations of a contract does not necessarily mean
the contract is, in fact, ambiguous. Columbia Gas Transmission Corp. v. New Ulm Gas, 940 S.W.2d
587, 589 (Tex. 1996). The contract must be examined as a whole in order to ascertain whether there
is only one reasonable interpretation, permitting a court to provide "a definite or certain meaning as
a matter of law." Id. The pertinent contract language at issue states: "[W]e do cover . . . vehicles
. . . used for recreational purposes . . . ." (Emphasis omitted.) We now examine this statement in
light of the contract as a whole and determine whether the exception is broad enough to include
Neal's race cars.
Â Â Â Â Â Â Â Â Â Â Â Â Farmers maintains that Neal's race cars were excluded from coverage because they were not
"vehicles used for recreational purposes" in the context of the exception to the policy's general
exclusion of motor vehicles. Recreation is generally defined as "refreshment by means of some
pastime, agreeable exercise, or the like," or as "a pastime, diversion, exercise, or other resource
affording relaxation and enjoyment." The Random House Dictionary of the English
Language 1613 (2d ed. 1987). Neal's position is that because he drove and worked on his race cars
for fun, or as a diversion or hobby, his activities with respect to the cars conform to this general
definition. In other words, because Neal's race cars were used as a means of refreshment or
diversion, it is the equivalent of saying they were used for recreational purposes. 
Â Â Â Â Â Â Â Â Â Â Â Â Attempting to strengthen this argument, Neal cites City of Bellmead v. Torres, in which the
Texas Supreme Court noted that the Legislature's definition of "recreational purposes" included
"activities such as hunting, fishing, swimming, boating, camping, picnicking, hiking, pleasure
driving, nature study, water skiing and water sports." City of Bellmead v. Torres, 89 S.W.3d 611,
613 (Tex. 2002) (emphasis added). We find wholly unpersuasive Neal's comparison of the
Legislature's use of "pleasure driving" to the only activities for which Neal's race cars are suited. It
is highly unlikely that the Legislature, when using the term "pleasure driving," envisioned individuals
"screaming" down a straight, quarter-mile stretch of pavement. It seems incongruous to think of
these vehicles as being driven for pleasure. One of Neal's race cars, for example, has a 230-inch
wheelbase; can only burn methanol or high-octane automotive fuel; has only two speeds: idle or
"wide open" (i.e., the car either idles or travels at speeds approaching 165 miles per hour); has an
extremely limited turning radius, as it is designed to travel in a straight line; requires coolant and fuel
to be replenished after every quarter mile; and must be stopped by parachute. Neal's own testimony
reveals that, if the car was driven even for a mile or two, its transmission would "blow up." 
Â Â Â Â Â Â Â Â Â Â Â Â While not in itself dispositive, it is instructive to note other types of motor- or engine-propelled vehicles that are specifically excepted from the policy's general exclusion in order to
determine whether the race cars described above could possibly have been contemplated by the
parties. Excepted, for example, are devices for assisting the handicapped, power mowers, golf carts,
and farm equipment. It is highly unlikely that Neal's race cars would normally be included in the
same category as these less mechanically sophisticated (and much less expensive and dangerous)
vehicles; however, the additional phrase characterizing excepted vehicles as those "used for
recreational purposes" still suggests the possibility of coverage.
Â Â Â Â Â Â Â Â Â Â Â Â One difficulty with Neal's application of the general definition of recreation to the facts in
this case is that it invites use of a substantially subjective test. We recognize that, although there are
many categories of activities generally recognized as recreational, to adopt a definition of recreation
that includes any activity one enjoys would undermine any purposeful exclusion of property as
inevitably must be considered in the context of homeowners insurance coverage. To some, even an
activity as mundane as gardening may be considered recreational; to others, gardening may be
viewed as an interminably tiresome chore. Similarly, while Neal undoubtedly enjoyed working on,
maintaining, and racing his cars, it is just as likely that others would consider such activities
unpleasant, tedious, and hazardousânot recreational. 
Â Â Â Â Â Â Â Â Â Â Â Â If we were to adopt a definition as global as Neal suggests, it would be particularly significant
that even Neal's characterizations of his race cars were not altogether consistent. The record
indicates that, during the four tax years from 1992 through 1995, Neal himself categorized his race
cars as being used for business purposes and, while depreciating their value in each of the four tax
years, conspicuously failed to include them in Part V of IRS Form 4562, which asks taxpayers to list,
among other things, automobiles, other vehicles, and property used for entertainment, recreation, or
amusement. This, however, is only some evidence against Neal's position that he used his race cars
for recreational purposes. 
Â Â Â Â Â Â Â Â Â Â Â Â Although reasonable minds may differ in their view of what constitutes a recreational activity
or, more specifically, what is encompassed in the phrase "vehicles used for recreational purposes,"
it is Farmers' unfortunate position to have state-approved or state-promulgated forms


 to use in its
homeowners policies that employ that rather elastic language. Not only are exceptions and
limitations to coverage generally construed strictly against the insurer and in favor of the insured,
Hallman v. Allstate Ins. Co., No. 05-02-00962-CV, 2003 Tex. App. LEXIS 6531, at *5 (Tex.
App.âDallas July 30, 2003, no pet.), but courts must also "adopt the construction of an exclusionary
clause urged by the insured as long as that construction is not unreasonable, even if the construction
urged by the insurer appears to be more reasonable or a more accurate reflection of the parties'
intent." Nat'l Union Fire Ins. Co. v. Hudson Energy Co., 811 S.W.2d 552, 555 (Tex. 1991). 
Although we are not bound by the trial court's findings, we may overturn them only if, after weighing
all the evidence in the record, we determine they are "so against the great weight and preponderance
of the evidence as to be clearly wrong and unjust." Ortiz, 917 S.W.2d at 772.
Â Â Â Â Â Â Â Â Â Â Â Â Neal testified he and his son took the dragster to the races during the warmer months of the
year as a "recreational activity," before preparing for hunting season. Neal also testified that, during
the cooler months, he and his son would work on their cars as a father and son activity and would
"play with them, monkey with them, tinker with them . . . for enjoyment," "for fun," and "for
recreational purposes." Neal's wife agreed with the "recreational purposes" categorization of the
activity. Neal testified that, in season, the family would take the dragster to races approximately
once a month, depending on the family budget; that, although he did win money on occasion, he
never won enough in any race to pay the expenses he and his family incurred in getting to and
participating in it, and that he justified the loss of money because he considered it "recreational
activity." Neal described two categories of participants on the racing scene, "Sportsman," into which
he and other hobbyists and part-timers fell, and "Professional," consisting of those who raced as a
business. He noted that, in contrast to Neal's racing practices, the business racers treat racing like
a job, working on it "every day of the week" and going to all the races they can find. 
Â Â Â Â Â Â Â Â Â Â Â Â We are called on to determine whether, considering the evidence as a whole, the trial court's
finding of recreational use was against the great weight and preponderance of the evidence. We
conclude the evidence was sufficient to support the trial court's finding that Neal's race cars were
used for "recreational purposes," within the common meaning of that phrase, that is, for "refreshment
by means of some pastime," or as "a pastime, diversion, exercise, or other resource affording
relaxation and enjoyment." Random House Dictionary, pg. 1613. 
Intentional Misrepresentation?
Â Â Â Â Â Â Â Â Â Â Â Â Farmers also contends that Neal's policy was void because Neal intentionally concealed or
misrepresented material facts or circumstances. Specifically, Farmers contends Neal intentionally
concealed the existence of the race cars because he did not own them at the time he purchased his
insurance policy and failed to affirmatively disclose to Farmers that he subsequently purchased the
cars and was storing them on the residence premises. The record itself contains no evidence Neal
intended to conceal or misrepresent material facts in an effort to defraud Farmers. On the contrary,
the record reflects that, on at least two occasions, Neal contacted Farmers with information he
thought relevant to the policy in question, thinking that adjustments to the policy might be necessary. 
Farmers was certainly entitled to be informed of the existence of this highly unusual property, but
we find there was sufficient evidence to support the trial court's conclusion that Neal's failure to
report the purchase did not amount to intentional concealment, misrepresentation, or fraud.
Â 
Â Â Â Â Â Â Â Â Â Â Â Â We, therefore, affirm the judgment of the trial court.
Â 
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Josh R. Morriss, III
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Chief Justice

Date Submitted:Â Â Â Â Â Â Â Â Â Â October 15, 2003
Date Decided:Â Â Â Â Â Â Â Â Â Â Â Â Â October 29, 2003



11-029-CV%20MM%20Slanker%20Opinion%20mtd_files/image001.png"
 o:title=""/>
 
 
 
 




Â 

Â 

Â 

Â 

Â 

Â 

Â 

Â 

Â 

 In
The

   Court
of Appeals

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Sixth
Appellate District of Texas at Texarkana

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  ______________________________

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  No. 06-11-00029-CV

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  ______________________________

Â 

Â 

Â 

Â 

IN THE MATTER OF THE
MARRIAGE OF CHRISTINE RUTH SLANKER AND
TED EUGENE SLANKER, JR., AND IN THE INTEREST OF 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  T.L.S., A MINOR CHILD

Â 

Â 

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 


Â 

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  On Appeal from the County Court at Law

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Lamar County, Texas

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Trial
Court No. 77863

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 


Â 

Â 

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Before Morriss, C.J.,
Carter and Moseley, JJ.

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Memorandum Opinion by Chief Justice Morriss








Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  MEMORANDUM OPINION

Â 

Â Â Â Â Â Â Â Â Â Â Â  Ted Eugene
Slanker, Jr., and Christine Ruth SlankerÂafter concluding that they no longer
wished to remain married to each other and struggling through two years of
contempt proceedings, restraining orders, depositions, motions to compel
discovery, at least three settings for final hearing, two attorneys for
Christine, and a trial conducted sporadically December 13Â16, 2010Âfinally
obtained a signed divorce decree and property division December 31, 2010.[1]Â  Ted appeals, urging twelve, often
multifarious, points of error accompanied by almost forty pages of stated facts
and vehement argument and praying for remittitur or for remand.Â  Christine, with a micro-brief containing just
three lines of argument, agrees that the trial court erred and prays for
remand.Â  Because we conclude that (1)
there was harmful error and that (2) remittitur or rendition is not
appropriate, we reverse the trial courtÂs judgment and remand this case to the
trial court for a new trial.

(1)Â Â Â Â Â Â Â  There Was Harmful Error

Â 

Â Â Â Â Â Â Â Â Â Â Â  Ted
complains at length about the trial courtÂs valuation and characterization of
sizeable portions of the property divided and the propriety of its division,
the exclusion of TedÂs expert witness testimony, and the sorts of liens used by
the trial court to secure TedÂs payment of amounts ordered.Â  He also argues that, because the oral
pronouncement by the court differs noticeably from the written judgment, error
exists.Â  The details of the matters
leading up to the divorce are largely irrelevant to our decision; thus, we will
focus on the legal effect of the actions taken by the trial court.Â  On the other hand, a few procedural points
are important, however, to explain the current posture of the case.

Â Â Â Â Â Â Â Â Â Â Â  After the
three-day trial, the trial court ruled orally December 28, 2010, in a telephone
conference, during which one attorney was snowed-in in New York state.Â  The decree of divorce was signed December 31,
2010, the last day in office for the trial judge.Â  In addition, Ted alleges that the judgment
was signed by the court without first being sent to TedÂs attorney to
review.Â  Ted argues that many of the
errors in this judgment resulted from that failure.[2]Â  

Â Â Â Â Â Â Â Â Â Â Â  The new
trial judge granted judgment nunc pro tunc January 19, 2011, to make a few,
more technical, changes.Â  The new judge
declined to address other, more substantive, matters raised in a motion for new
trial, however, stating that, as he did not hear the case, he was uncomfortable
altering the judgment signed by the prior judge.

Â Â Â Â Â Â Â Â Â Â Â  The
property in dispute included some of TedÂs stockÂthat had changed both in value
because of market fluctuations and in number because of a reverse five-to-one
splitÂa cattle ranch and an associated but separate business selling grass-fed
beef and other specialty meat products.Â 
Also involved are a residence, a rental house, animals, an airplane, a
boat, bank accounts, and various debts.

Â Â Â Â Â Â Â Â Â Â Â  Although the parties agree that the
judgment should be reversed, such a result is not automatic merely
because both parties state they desire one.Â 
Both the rules and caselaw state that a reviewing court can reverse only
when there is error in the judgment of the court below.[3]Â  Davis v. Bryan & Bryan, Inc., 730 S.W.2d 643, 644
(Tex. 1987); Estate of Clinton v. S. Pac. Transp. Co., 709 S.W.2d 636, 639 (Tex. 1986); Sears,
Roebuck & Co. v. Marquez, 628 S.W.2d 772, 773 (Tex. 1982); Chrismon
v. Brown, 246 S.W.3d 102,
116 (Tex. App.ÂHouston [14th Dist.] 2007, no pet).

Â Â Â Â Â Â Â Â Â Â Â  ChristineÂs abbreviated brief to
this Court does, however, simplify one aspect of our review considerably.Â  In a civil case on appeal, we Âaccept as true
the facts stated unless another party contradicts them.ÂÂ  Tex.
R. App. P. 38.1(g).Â  There are no
contradictions to the facts stated by Ted, because Christine provides no
alternative to TedÂs version of the facts on appeal.[4]

Â Â Â Â Â Â Â Â Â Â Â  Nevertheless, despite the agreement
that this case should be reversed, we must still find reversible error to
provide this remedy.Â  We now turn to that
analysis.

Â Â Â Â Â Â Â Â Â Â Â  We first address TedÂs argument that
the trial court committed reversible error by refusing to allow his named
expert witness, James Davis, to testify about the value of the business related
to the ranch, SlankerÂs Grass-Fed Meat (SGFM), and the value of community property
goodwill connected with the business.Â  For
the exclusion of evidence to constitute reversible error, the complaining party
must show that (1) the trial court committed error, and (2) the error probably
caused the rendition of an improper judgment.Â 
State v. Cent. Expressway Sign Assocs., 302 S.W.3d 866, 870 (Tex.
2009); McCraw v. Maris, 828 S.W.2d 756, 757 (Tex. 1992); Gee v.
Liberty Mut. Fire Ins. Co., 765 S.W.2d 394, 396 (Tex. 1989).

Â Â Â Â Â Â Â Â Â Â Â  At trial, ChristineÂs counsel
claimed never to have been given DavisÂ curriculum vitae (CV) or informed of
either DavisÂ expected use as a witness or of his testimony.Â  The trial court refused to allow him to
testify.Â  The record shows, however, that,
at a pretrial hearing, ChristineÂs counsel explicitly acknowledged receiving
his CV, report, and opinion concerning the nature of his testimonyÂall some
eight months before trial.Â  It is clear
that DavisÂ testimony would have been helpful and relevant.Â  It is also apparent that he was not allowed
to testify because the trial court was inaccurately informed that counsel had
not been given notice of DavisÂ existence, much less a CV or a report.

Â Â Â Â Â Â Â Â Â Â Â  It thus appears that
the witness was excluded for failure to timely identify and provide a
report.Â  See Tex. R. Civ. P. 193.6.Â  It further appears that the decision was made
in reliance on erroneous information provided by ChristineÂs counsel at
trial.Â  A trial courtÂs exclusion of an
expert who has not been properly designated can be overturned only on a finding
of abuse of discretion.Â  Mentis v. Barnard,
870 S.W.2d 14, 16 (Tex. 1994).Â  In this
case, the trial court was provided inaccurate information, and disregarded the
actual state of affairs.Â  We conclude
that the exclusion of DavisÂ testimony was an abuse of discretion.

Â Â Â Â Â Â Â Â Â Â Â  We must next determine whether the
trial courtÂs error in excluding DavisÂ testimony probably caused the rendition
of an improper judgment.Â  Tex. R. App. P. 44.1(a); Waffle
House, Inc. v. Williams, 313 S.W.3d 796 (Tex. 2010).Â  To satisfy this standard, the improperly
excluded evidence must be controlling on a material issue and not cumulative of
other, properly admitted evidence.Â  Mentis,
870 S.W.2d at 16; Southland LloydÂs Ins. Co. v. Tomberlain, 919 S.W.2d
822, 828 (Tex. App.ÂTexarkana 1996, writ denied).Â  The rest of the evidence also must not have
been so one-sided that the error likely made no difference in the
judgment.Â  Cent. Expressway Sign
Assocs., 302 S.W.3d 866.Â  Â[I]t is
not necessary for the complaining party to prove that Âbut forÂ the exclusion
of evidence, a different judgment would necessarily have resulted.ÂÂ  McCraw, 828 S.W.2d at 758.Â  The complaining party must show only Âthat
the exclusion of evidence probably resulted in the rendition of an improper
judgment.ÂÂ  Id. Â The role that excluded evidence plays in the
context of the trial is also important.Â 
Thus, the exclusion or admission is likely harmless if the evidence was
cumulative, or the rest of the evidence was so one-sided that the error likely
made no difference in the judgment.Â  Reliance
Steel & Aluminum Co. v. Sevcik, 267 S.W.3d 867, 873 (Tex. 2008).Â  But if erroneously admitted or excluded
evidence was crucial to a key issue, the error is likely harmful.Â  Id.Â 
Determining whether a particular error is harmful depends on the
particular case.Â  Cent. Expressway
Sign Assocs., 302 S.W.3d at 870.Â  In
making this determination, we review the entire record.Â  Id.

Â Â Â Â Â Â Â Â Â Â Â  In this case, the excluded testimony
was the only expert testimony from either party that would have been provided
on these subjectsÂessentially that SGFM had net losses of over $200,000.00 from
2006 to 2009 and that Ted had made repeated loans from sales of separate
property stocks to keep the company liquid.Â 
The expert would also have testified that any business goodwill was minimal
because of the losses and that any that did exist was TedÂs because of his
immersion in and total involvement with the business and its marketing, while
ChristineÂs actual efforts connected with that business were at best
minimal.Â  As the overriding matter at
issue was the valuation and nature of the property, it is difficult to think
that a possible error of approximately $200,000.00 in determining the value of
the estate would be considered deÂ minimus.Â 
It was thus crucial to the key matter before the court, and its
exclusion was thus likely harmful.

Â Â Â Â Â Â Â Â Â Â Â  Ted also argues that the trial court
used values for stock owned by Ted that were simply wrong.Â  Essentially, he argues that the trial judge
followed red herrings laid out by ChristineÂs counsel, rather than the
evidence.Â  He also argues that the value
placed on the ranch was without any real support in the evidence.Â  The most extreme allegations involve what
either is, or at one point was, the major asset other than the ranch, a large
amount of stock owned by Ted.Â  Although
the evidence showed that the particular stock (TZA) had suffered a one-to-five
inverse split, reducing the number of shares owned from 16,500 to 3,300 and
that both that stock and the predecessor stock which had been traded for it had
lost value in a substantial manner, Christine continued to argue that Ted had
sold stock and secreted in some unknown place hundreds of thousands of
dollars.Â  Christine appears to have
compounded the error by using the pre-split number of shares and multiplied
that by the post-split value per share to calculate the amount that should
exist in the brokerage account and which obviously was not there.Â  

Â Â Â Â Â Â Â Â Â Â Â  The result was that ChristineÂs
counsel informed the court that the value of the two stocks was over $800,000.00,
when the remaining shares of stock at the time of trial was much less.

Â Â Â Â Â Â Â Â Â Â Â  The trial court did not make any
findings of fact about the stock valuation, and its judgment contains no
specific references to stock valuations other than a generic statement that the
Wolverton account, worth $100,000.00, was given to Ted.Â  The court did find that Ted could not trace
either stock or cattle back to separate property, thus evidently concluding all
such property was community.Â  However,
Christine also acknowledged that the brokerage account had belonged to Ted well
before the marriage and that the predecessor stock was in the account at the
time of their marriage.Â  Thus, though her
testimony that particular stocks were acquired during marriage was correct, the
evidence indicates for the most part not a purchase from outside, but shifting
of assets from one stock to another within the account, a factor suggesting
that tracking TedÂs separate property might be appropriate.

Â Â Â Â Â Â Â Â Â Â Â  In a tertiary argument, Ted also
complains that funds derived from his separate property accounts made up
shortfalls in the community-property business, but were not properly credited
in his favor by the trial court.

Â Â Â Â Â Â Â Â Â Â Â  Although counselÂs argument may have
merit, we have not followed the argument entirely.Â  But, based on TedÂs recitation of numerous
facts, pointing to error in the trial court, see Tex. R. App. P. 38.1(g), we conclude that the trial court
erred based on the evidence and argument at trial, in characterizing the
amounts involved in the brokerage account as wholly community.

Â Â Â Â Â Â Â Â Â Â Â  Because there is reversible error,
we are authorized to accept the partiesÂ agreement that reversal is appropriate
here.

(2)Â Â Â Â Â Â Â  Remittitur or Rendition Is Not
Appropriate

Â 

Â Â Â Â Â Â Â Â Â Â Â  TedÂs reply brief argues that,
notwithstanding the agreement that error occurred, Ted has also requested a
remittitur or rendition.Â  He asserts,
therefore, that a simple reversal and remand is not enough.Â  A rendition or a suggestion of remittitur
could be available in limited circumstances where this Court was presented with
evidence of such absolute clarity that it could render a judgment of property
division differing from the trial courtÂs, or could suggest a remittitur to
correct an imbalance in the intentionally disproportionate division made by the
trial court.Â  See Phillips v. Phillips,
296 S.W.3d 656, 682 n.12 (Tex. App.ÂEl Paso 2009, pet. denied); Burney v.
Burney, 225 S.W.3d 208, 220 n.3 (Tex. App.ÂEl Paso 2006, no pet.).

Â Â Â Â Â Â Â Â Â Â Â  But, the evidence is not such as to
allow this Court to render judgment or suggest a remittitur as requested by
Ted.Â  The division of multiple
properties, some separate, some community, is by its very nature a judgment
call based on the evidence and what is believed by the trial court.Â  This Court, although it may conclude certain
property is separate and certain property is community, is not in a position to
observe the parties and bury itself in the minutiae of all the lists of
properties these parties evidently believed important enough to demand
possession of as a result of the division.Â 
In such a situation, rendition is not appropriate.Â  Ragsdale v. Progressive Voters League,
801 S.W.2d 880, 882 (Tex. 1990); see Rosenblatt v. Freedom Life Ins. Co. of
Am., 240 S.W.3d 315, 324 (Tex. App.ÂHouston [1st Dist.] 2007, no pet.); McMillin
v. State Farm Lloyds, 180 S.W.3d 183, 211 (Tex. App.ÂAustin 2005, pet.
denied) (ÂWe cannot render judgment . . . because the evidence is not
conclusive.Â).

Â Â Â Â Â Â Â Â Â Â Â  An appellate court can also suggest
an appropriate remittitur.Â  However, the
availability of that remedy is limited in scope.Â  Typically, it exists in conjunction with
excessive damage awards.Â  See Tony
Gullo Motors I, L.P. v. Chapa, 212 S.W.3d 299, 315Â16 (Tex. 2006) (Johnson,
J. concurring); Larson v. Cactus Util. Co., 730 S.W.2d 640, 641 (Tex.
1987); CIGNA Healthcare of Tex., Inc. v. Pybas, 127 S.W.3d 400, 415
(Tex. App.ÂDallas 2004, judgmÂt withdrawn).Â 
It can be appropriate regarding a default judgment with a variance
between the pleadings and the judgment actually entered.Â  Gulf States Petroleum Corp. v. Gen. Elec.
Capital Auto Lease, 134 S.W.3d 504, 510 (Tex. App.ÂEastland 2004, no pet.);
cf NatÂl Freight, Inc. v. Snyder, 191 S.W.3d 416, 426 (Tex.
App.ÂEastland 2006, no pet.) (declining to allow remittitur as remedy for
failure to properly segregate past medical expenses at trial).

Â Â Â Â Â Â Â Â Â Â Â  When a record does not allow us to
determine an amount of remittitur that might be properly suggested, that remedy
is likewise unavailable, and we must remand for a new trial.Â  See Downing v. Burns, 348 S.W.3d 415 (Tex.
App.ÂHouston [14th Dist.] 2011, no pet.).Â 
In such a situation, the exact amounts to be provided to each party are
not known with the clarity that might allow remittitur to be available.Â  See Playboy Enterp., Inc. v. Editorial
Caballero, S.A. de C.V., 202 S.W.3d 250, 272 (Tex. App.ÂCorpus
Christi 2006, pet. denied).

Â Â Â Â Â Â Â Â Â Â Â  We decline the invitation to either
render judgment or suggest a remittitur.

Â 

Â Â Â Â Â Â Â Â Â Â Â  We reverse the judgment of the trial
court as to the property division and remand the cause for a new trial on that
subject.

Â 

Â Â Â Â Â Â Â Â Â Â Â  Â Â Â Â Â Â Â Â Â Â Â  Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Josh
R. Morriss, III

Â Â Â Â Â Â Â Â Â Â Â  Â Â Â Â Â Â Â Â Â Â Â  Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Chief
Justice

Â 

Date Submitted:Â Â Â Â Â Â Â Â Â  November
2, 2011Â Â Â Â Â  

Date Decided:Â Â Â Â Â Â Â Â Â Â Â Â  November
18, 2011

Â 











[1]December
31, 2010, was the last day on the job for the trial judge.Â  The newly elected judge of the Lamar County
Court at Law took office the next day.Â 
That transition affected this case.





[2]The
judgment signed by the trial judge who tried the case and granted the divorce ordered
a $300,000.00 judgment to be paid in 100 monthly installments of $300,000.00
each.Â  It also contained other details that
were either incomplete or inconsistent with the oral pronouncements of the
trial court, as shown by the motion for judgment nunc pro tunc filed by
opposing counsel and confirmed by the reporterÂs record.Â Â  In that regard, there was also a complaint
about a schedule A that was part of the inventory used by ChristineÂs counsel
and attached to a proposed judgmentÂbut although not used or referenced by the
trial judge had been attached to the judgment, incorrect tenses being used in
connection with stock account language, a failure to distinguish between a
business and a website awarded to Ted, and several other matters.Â  We also note, that even though the findings
of fact state that only Christine had separate property, the judgment itself is
supported by an attachment that specifies certain property as being separate
property of Ted.Â  Ted also contends that the errors in characterization of property and
in valuing property led to an unsupportable order of a $300,000.00 judgment
against Ted to ÂequalizeÂ the estate.

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Such
alleged errors are not unique to the judgment.Â 
In a motion for contempt, ChristineÂs attorney alleged that Ted was in
contempt because he had been Âordered to provide 90 pounds of human meat per
month and 150 pounds of dog and cat meat per month to Christine . . . and owes
petitioner 630 pounds of human meat and 1050 pounds of dog and cat meat which
he has not provided to her and their child.ÂÂ 
The dogs, cats, and humans in the area applaud this failure.





[3]This
case does not involve an agreement by the parties to dismiss an appeal under
Rule 42.1 of the Texas Rules of Appellate Procedure.Â  Tex.
R. App. P. 42.1.

Â 





[4]That
procedural artifact does not necessarily establish TedÂs recited facts for
general purposes, on a retrial, but allows us to accept TedÂs statement of
facts as a given for the purposes of our analysis.