# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-03-00193-CV

**William B. "Tex" Bloys and wife, Verda Raye Bloys, Appellants**

**v.**

**Tony Wilson, Appellee**

### FROM THE DISTRICT COURT OF MCCULLOCH COUNTY, 198TH JUDICIAL DISTRICT
### NO. 2002-087, HONORABLE EMIL KARL PROHL, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

William B. "Tex" Bloys and Verda Raye Bloys appeal from a judgment favoring Tony Wilson. The judgment declares that appellants have no legal or equitable interest in a 218-acre tract in McCulloch County, orders them to remove a manufactured home from the tract, enjoins them from damaging or harassing Wilson and his livestock, and orders appellants to pay Wilson $10,000 in attorney's fees, plus an additional $5000 for each level of appeal. The appellants contend that the evidence does not support the court's findings, injunction, and award of attorney's fees to Wilson. We will affirm the judgment.

## BACKGROUND

Appellants purchased a 218-acre tract west of Brady around September 1999. Appellants bought a manufactured home and moved it onto the tract. Their son moved a travel trailer onto the tract and lived there while renovating a stucco home on the tract.

A deed signed by appellants on April 13, 2000 memorializes their sale of the tract to Wilson. The assumption warranty deed recites that, in exchange for the deed, Wilson paid appellants $10 and assumed their $147,307.95 note payable to the previous owners.

On April 30, 2000, appellants and Wilson signed a document entitled "Lease option for 161 acres more or less of the 218 acres & option to buy 57 acres, more or less of the 218 acres in McCulloch County" ("the contract"[1]). The contract contains 22 "items," some of which have subparts. Some of the items concern rights or responsibilities regarding the entire 218 acres, some items concern only either the 161-acre parcel or the 57-acre parcel, and some items concern both parcels, but describe separate rights regarding each parcel. Illustrating the latter is Item No. 2, which provides as follows:

> Wilson and Bloys have agreed verbally Saturday, March 25, 2000 to forgo any more survey expense and the line drawn by Mr. Wilson showing approximately 161 acres, more or less, south of the north-south fenceline shall be that track [sic] Bloys will lease from Wilson.
>
> A.  Tony Wilson (buyer) will hereby grant to Tex Bloys a lease of the 161 acres more or less for $2.50 per acre per month with a $0.25 increase per year on each of lease. Length of lease to be ten years with one ten year option. See sample of lease for 161 acres.

---

[1] Although whether the document comprises a contract is the central contested issue in this appeal, we will refer to the document as a "contract" for simplicity.

B. Bloys to lease 161 acres, more or less, south of survey and fenceline (as shown in red on survey plot plan) at a rate as shown on attached rental schedule.

C. The tract north of the line stated in Item No. 2 consisting of approximately 57 acres more or less, will be that tract that Bloys will have 2, 10 year leaseholds as explained in Item No. 2A.

Under Item No. 5, appellants are to pay all taxes on the entire 218 acres at the beginning of the contract. Under Item No. 7, Wilson and appellants are to share equally the costs of a fence replacement on all 218 acres and the costs of a water well, the water lines, and their maintenance and replacement.

Some items deal specifically with appellants' rights and responsibilities with regard to the 57 acres:

Item No. 9    Bloys, for the consideration of this lease for 20 years will pay all taxes and insurance on the improvements located on the 57 acres, more or less, and all personal liability insurance if any.

Item No. 10   Bloys will have first option to purchase 57 acres, more or less, as shown in Item No. 13 and 17.

. . . .

Item No. 13   Tony Wilson to grant to Bloys an option to buy the approximate 57 acres, more or less during the term of the 10 year lease or during the term of the 2nd 10 year period for a price of $950.00 per acre plus all improvements located thereon. Less the 1999 mobile home which is not to be computed in purchase option price as Bloys is paying lienholder as his separate estate. Also not to be computed is a 24 X 14 ft. warehouse belonging to Mrs. Bloys.

. . . .

Item No. 15   If purchase option is granted and executed by Bloys, Wilson will consider financing the 57 acres, more or less, at a purchase price of $950.00 per acre. Bloys to pay for survey, if required, to establish an

3

exact number of acres.  Down payment to be $2,800.00 at closing of purchase option.

Item No. 16    If Bloys executes purchase option, Wilson will give Bloys $1.00 per acres credit on each acre that Bloys has leased to be applied on Bloys purchase price at the time Bloys executes his purchase option.

Item No. 17    If Wilson grants to Bloys purchase option, the following is a projection of financing:

Purchase price                         $54,700.00
Down Payment of 5%                    2,800.00
Loan to be                             $51,900.00

Payable in annual payment of  $ 2,600.00
Plus interest of 8.5%                  4,400.00
        1st year of payment    $  7,000.00

The contract contains no items or clauses concerning breach, default, or termination of the rights to purchase or occupy all or any portion of the 218 acres.  According to Wilson, no property description or accurate map was attached to the contract at the time of its execution.  The map attached to the copy introduced into evidence indicates that it describes 57 acres out of a tract of either 108 or 165 acres (165 is printed on the map, but struck through and interlineated with "108 " in one part of the map)—neither of which is equal to the 161 acres supposedly leased in Item No. 2A.

Mr. Bloys testified that he never paid rent and conceded that he verbally surrendered the right to possess the 161-acre parcel sometime in the summer of 2000.  Appellants and their son continued to live in the homes on the 57-acre parcel and perform work on the land, fences, water supply, and stucco home.  Although at trial Wilson criticized the quality of their repair and construction work, appellants argue that he never complained before attempting to evict them.  On April 5, 2002, Wilson sent them notice to vacate, then filed a forcible entry and detainer action

4

against them. Wilson admits that this was the first written notice he sent to appellants that the contract was breached or that they must vacate the tract.

Appellants then filed this suit seeking injunctive relief, a declaratory judgment, and damages. They alleged that Wilson had removed trees near their house without permission, driven recklessly near their homes and children, installed structures and utilities without permission, removed roofs from structures and allowed damage to appellants' property therein, released infected livestock on the tract, and verbally abused appellants. They sought a declaration that the purchase option on the 57 acres is severable from the lease of the 161 acres and remains valid and in force. They sought an injunction preventing Wilson from interfering with their peaceable possession of the tract; they alternatively sought recovery in quantum meruit for work done on the tract. They also sought recovery for damages to their personal property.

Wilson denied appellants' claims and filed a cross action. He requested a declaration that appellants had no right or title to any part of the tract. He also complained that appellants had interfered with and assaulted his employees, guests, and livestock, attempted to obstruct his access to his land, trespassed upon and refused to vacate his land, and constructed deer stands and hunted his land in violation of a court order; Wilson requested an injunction against these activities. He further sought damages for appellants' allowing their dogs to kill his sheep, taking 200 bales of hay, installing unsafe electrical works, wrongfully occupying the land, and disconnecting a pipe providing water to his animals.

The court held a nonjury trial at which the parties testified regarding their version of events. Mr. Bloys recalled that the right to buy the land under the contract was a negotiated

5

consideration exchanged for a sales price lower than he desired, and that the contract comprised two severable leases on the 161 acres and the 57 acres. Wilson recalled that the purchase price was a negotiation, but that the contract covered the entire 218 acres; he testified that he considered the contract terminated in the summer of 2000 due to the nonpayment of rent, but did not move to evict appellants essentially as a courtesy to help appellants survive tough personal economic times. Both sides testified that someone affiliated with the other side had been abusive and harassing, but did not recall their own conduct to be so. Appellants' attorney claimed his clients had incurred $18,562.50 in attorney's fees. Wilson's attorney claimed his client had incurred $22,282.02 in attorney's fees.

The district court's judgment mostly favored Wilson. The court declared that appellants have no legal or equitable interest in the 218 acres, and ordered them to remove their manufactured home from the tract and repair any damage caused by that removal. The court permanently enjoined appellants from harassing, injuring, or killing Wilson's livestock, and from harassing or threatening him. The court also barred appellants from removing anything affixed to the stucco house or on the real property. In the judgment, the court awarded Wilson $10,000[2] in attorney's fees for the trial, $5000 in the event of appeal, and $5000 in the event of petition for review to the Texas Supreme Court.

In its findings of fact and conclusions of law, the court found that the contract did not contain language creating or granting an option, did not specify which 57 acres were included in any option, and did not create a severable agreement as to the 57 acres. The court also found that

---

[2] The findings of fact and conclusions of law state that the court awarded $11,636 in attorney's fees for the trial.

appellants failed to insure the premises, pay the taxes, or pay the rent as required by the contract. The court concluded that the contract did not reflect a meeting of the minds, that the parties' intent is not apparent from the document, that the document should be interpreted against appellants because Mr. Bloys, a real estate agent, drafted it, and that the contract was vague, void, and no longer in effect.

## DISCUSSION

Appellants raise seven issues on appeal, most of which concern the interpretation and viability of the contract. They contend that the evidence does not support the district court's determinations (1) that no option contract existed as to the 57 acres, (2) that the contract was not severable, and (3) that the contract lacked a description sufficient to identify the 57-acre tract. They also contend that the court erred by finding that the contract was terminated as to the 57 acres and by granting injunctive relief to Wilson. Appellants further contend that the court erred by denying them attorney's fees but awarding such fees to Wilson.

**Existence and nature of contract**

Appellants challenge the district court's findings and conclusions relating to the absence of a contract. Appellants contend that the contract on the 57 acres is valid and binding because the parties freely entered into the agreement, that the option for the 57 acres was not an agreement to contract into the future, that the rules of construction support construing the agreement as valid even if it is not plainly so, that any ambiguities should be construed against Wilson as lessor, and that the conduct of the parties demonstrates the existence of a contract. Appellants also contend

7

that the contract comprises two severable agreements—one concerning the 161 acres and one concerning the 57 acres—and that the land was sufficiently described.

We measure the sufficiency of the evidence supporting a trial court's findings of fact in a bench trial by against the same standards used to review a jury's verdict on jury questions. *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991). In reviewing legal sufficiency, we consider all the evidence in the light most favorable to the prevailing party, indulging every inference in that party's favor. *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 285-86 (Tex. 1998); *Westech Eng'g, Inc. v. Clearwater Constructors, Inc.*, 835 S.W.2d 190, 195 (Tex. App.—Austin 1992, no writ). In reviewing factual sufficiency, we consider all of the evidence and uphold the finding unless the evidence is too weak to support it or the finding is so against the overwhelming weight of the evidence as to be manifestly unjust. *Westech*, 835 S.W.2d at 196. The trier of fact is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Cohn v. Commission for Lawyer Discipline*, 979 S.W.2d 694, 696 (Tex. App.—Houston [14th Dist.] 1998, no pet.). We will not substitute our judgment for that of the trial court merely because we might reach a different conclusion. *Id.*; *Westech*, 835 S.W.2d at 196.

We review a trial court's conclusions of law *de novo*; even if we find a conclusion of law is incorrect, we will affirm the judgment if it can be sustained by any correct legal theory supported by the evidence. *Cohn*, 979 S.W.2d at 697; *Westech*, 835 S.W.2d at 196.

Formation of a binding contract requires a meeting of the minds with respect to its subject matter and essential terms. *Wal-Mart Stores, Inc. v. Lopez*, 93 S.W.3d 548, 555-56 (Tex. App.—Houston [14th Dist.] 2002, no pet.); *Ludlow v. DeBerry*, 959 S.W.2d 265, 272 (Tex.

8

App.—Houston [14th Dist.] 1997, no writ). The determination of a meeting of the minds, and thus offer and acceptance, is based on the objective standard of what the parties said and did—and not on their subjective state of mind. *Adams v. H & H Meat Prods., Inc.*, 41 S.W.3d 762, 771 (Tex. App.—Corpus Christi 2001, no pet.); *Angelou v. African Overseas Union*, 33 S.W.3d 269, 278 (Tex. App.—Houston [14th Dist.] 2000, no pet.). In determining mutual assent, the court considers the communications between the parties and the acts and circumstances surrounding those communications. *Komet v. Graves*, 40 S.W.3d 596, 601 (Tex. App.—San Antonio 2001, no pet.); *Angelou*, 33 S.W.3d at 278.

In construing a lease, courts seek the intention of the parties as expressed in the lease. *Sun Oil Co. v. Madeley*, 626 S.W.2d 726, 728 (Tex. 1982). Courts will enforce an unambiguous instrument as written, and ordinarily the writing alone will be deemed to express the parties' intentions. *Id*. Parol evidence is not admissible to render ambiguous a contract that on its face is capable of being given a definite, certain legal meaning. *Id*. Where the meaning of a contract is plain and unambiguous, a party's construction is immaterial. *Id.*

Whether a contract is ambiguous is a question of law that must be decided by examining the contract as a whole in light of the circumstances present when the contract was entered. *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996). If the contract's meaning is uncertain and doubtful or it is reasonably susceptible to more than one meaning, then it is ambiguous and its meaning must be resolved by a finder of fact. *Lenape Res. Corp. v. Tennessee Gas Pipeline Co.*, 925 S.W.2d 565, 573 (Tex. 1996) (citing *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex.1983)). If a contract is found to be ambiguous, parol evidence is

9

admissible to ascertain the true intent of the parties. *Friendswood Dev. Co. v. McDade + Co.*, 926 S.W.2d 280, 283 (Tex. 1996). The courts' primary concern is to ascertain and to give effect to the true intention of the parties. *Universal C.I.T. Credit Corp. v. Daniel*, 243 S.W.2d 154, 157-58 (Tex. 1951). To achieve this objective, courts will examine and consider the entire writing, seeking as best they can to harmonize and to give effect to all the provisions of the contract so that none will be rendered meaningless. *Id.*

In Texas, a writing is generally construed most strictly against its author and in such a manner as to reach a reasonable result consistent with the apparent intent of the parties. *Republic Nat'l Bank v. Northwest Nat'l Bank*, 578 S.W.2d 109, 115 (Tex. 1978). *But see Sirtex Oil Indus., Inc. v. Erigan*, 403 S.W.2d 784, 788 (Tex. 1966) (leases construed against lessor). If two constructions are possible, we should favor a construction rendering the contract possible of performance over one that renders its performance impossible or meaningless. *Republic Nat'l Bank*, 578 S.W.2d at 115.

### *Severability of contract*

Appellants contend that the contract comprises separate agreements regarding the 161-acre parcel and the 57-acre parcel, and that the behavior of the parties supports their argument that the agreements are severable. As set out above, the contract discusses the lease of the two parcels separately, discussing the lease of the 161 acres in Item Nos. 2A and 2B and the lease of the 57 acres in Item No. 2C. The contract requires a rental payment for the 161 acres, but does not require rent payment for the 57 acres, absent an inference from the language in Item No. 2C that the lease on the 57 acres is "as explained in Item No. 2A." Item No. 11 permits Wilson to establish

10

exotic animals on the 161 acres, but does not mention the 57 acres. The contract establishes appellants' rights to purchase the two parcels separately, discussing the 57 acres in Items No. 13-19 and the 161 acres in Items No. 20-21. Appellants contend that their surrender of the 161 acres for nonpayment of rent, contrasted with their rent-free occupation of the 57 acres for two years, indicate that Wilson viewed the leases as separate.

Other items and evidence support the district court's conclusion that the contract was not severable. The terms concerning the parcels are intermingled and intertwined in Item No. 2. Both items No. 2A and 2B refer to the lease of the 161 acres for 10 years with a 10 year option; Item No. 2A sets out an escalating rental rate and refers to a "sample of lease for 161 acres," while Item No. 2B refers to an attached rental schedule that illustrates the rate set up in Item No. 2A. Item No. 2C then asserts a lease of 57 acres on which Bloys "will have 2, 10 year leaseholds on as explained in Item No. 2A." The reference to Item No. 2A is vague. The only additional information in Item No. 2A is the optional nature of the second 10 years and the escalating rental rate, illustrated by the "sample of lease" attached to the contract; Bloys, however, indicates that the rent structure is irrelevant to the 57-acre parcel. Several other clauses apply to both parcels. Under items No. 7 and No. 8, Wilson and Bloys agreed to share on a 50/50 basis all costs of maintenance and replacement of the water well, water lines, fences, and gates on all 218 acres; there is no apportionment of appellants' responsibilities between the two parcels should the lease to one or the other be terminated. Items No. 5 and No. 9 refer to a single "lease" rather than plural leases. Under Item No. 5, Bloys agreed to pay "all taxes on the 218 acres at the beginning of the lease." Under Item No. 9, "Bloys, for the consideration of this lease for 20 years, will pay all taxes and insurance on the

11

improvements located on the 57 acres, more or less and all personal liability insurance if any."

Wilson explains his failure to evict appellants from the entire property for non-payment of rent as forbearance based on his desire to help appellants repay debts.

We conclude that sufficient evidence supports the court's finding and conclusion that the contract is not severable. The contract does not plainly create either separate leases or a single contract; this is the essence of ambiguity. The parties' behavior similarly could be construed as consistent with either a severable or a nonseverable contract. We cannot say that the evidence is too weak to support the district court's finding that the contract is not severable or that the finding is so against the overwhelming weight of the evidence as to be manifestly unjust.

### *Meeting of the minds*

Appellants argue that the evidence shows that the parties negotiated the contract and that their behavior illustrated that they agreed on the terms of the contract. They argue that any uncertainty arising from the absence of property description and accurate maps from the original agreement is resolved by the parties' behavior regarding the parcels, particularly their continued occupation of the 57 acres north of the fenceline mentioned in the contract.

The contract, however, is internally inconsistent. As discussed, some items speak to a single lease, while other items can be read to indicate two leases. The contract is inconsistent with regard to the nature of appellants' right to purchase the 57 acres. In Item No. 10, the contract states that "Bloys will have first option to purchase 57 acres, more or less, as shown in Item No. 13 and 17." Item No. 13 states, "Tony Wilson to grant Bloys an option to buy the approximate 57 acres,

12

more or less during the term" of the lease. These two items create different rights for appellants. Item No. 10 gives appellants a right of first refusal, meaning that if Wilson decides to sell the land, he must offer to sell the land to appellants before selling to someone else, but Item No. 13 describes an option, meaning that Wilson must sell the land to appellants any time during the lease they want to buy it. *See Riley v. Campeau Homes, Inc.*, 808 S.W.2d 184, 187 (Tex. App.—Houston [14th Dist.] 1991, writ dism'd by agr.); *Henderson v. Nitschke*, 470 S.W.2d 410, 412 (Tex. Civ. App.—Eastland 1971, writ ref'd n.r.e.) (quoting 51C C.J.S. Landlord & Tenants 88(3), p. 270). Item No. 17 states, "If Wilson grants to Bloys the purchase option . . . ," indicating that whatever option is created, it is not conferred at the time the contract is signed, but is contingent on future action by Wilson. The parties' behavior is not determinative of the type of option conferred because neither party tried to exercise it; even appellants' undisturbed occupancy of the 57 acres is consistent with a lease with the existence of a right of first refusal, a lease with an option to buy, or a benevolent permission of continued occupancy despite the expiration of any right or option. The inconsistencies in the language of the contract support the court's conclusion that there was no meeting of the minds regarding the nature of the right to purchase created.

The absence of an extant right to purchase moots appellants' challenge to the district court's finding that the contract did not adequately describe the property. Even if we were to conclude that the contract sufficiently described the property, the absence of a right to purchase justifies the court's refusal to issue appellants' requested relief. We decline to address the issue because it is not necessary to our disposition of the appeal. *See* Tex. R. App. P. 47.1.

13

**Breach of contractual duties**

The district court also found that appellants breached numerous contractual duties. It found that there was a complete failure of consideration. It specifically found that appellants failed to pay rent, provide insurance, or pay taxes as required.

Appellants admit that they failed to pay rent. The contract required payment of $2.50 per acre per month—at least on the 161 acres—and appellants paid nothing.

Appellants also admit that they failed to pay taxes as required. They undisputedly paid taxes on the manufactured home they installed on the property, but paid no other taxes on the property. The contract, signed April 30, 2000, required appellants to pay taxes on the entire 218 acres at the "beginning of the lease" (Item No. 5) and then to pay "all taxes and insurance on the improvements located on the 57 acres" (Item No. 9). Instead, Wilson paid the taxes.

Appellants contend that Wilson's payment of taxes thwarted their attempt to comply with the contract, but there is no evidence that they attempted to pay the taxes or reimburse Wilson near the due date for the taxes. Appellants introduced a letter dated May 2, 2002 they wrote to the McCulloch County tax assessor requesting that he deposit appellants' checks in a tax escrow account. They also introduced checks payable to the McCulloch County tax appraisal district that state on the memo line that they were made to the "tax escrow account on 57 acres"; the earliest of these checks is dated May 16, 2002. The letter and the checks are dated two years after the lease was signed and a month after Wilson sent appellants notice to vacate. Appellants also introduced a $700 check dated November 18, 2002 by which they claim they attempted to reimburse Wilson for the taxes; this check is dated thirty months after the lease began, seven months after the notice to vacate,

14

four months after appellants initiated this suit by requesting a temporary restraining order and days after Wilson sought summary judgment against their claims and filed his own petition for relief. These belated checks do not contradict the court's finding that appellants breached their obligation to pay taxes.

Appellants testified that they maintained insurance on the property and that Wilson's complaints that he was not the payee under the policy are unavailing because the contract does not specify who should be the payee. The parties also dispute whether appellants' maintenance and repair satisfied any obligations under the contract. We need not resolve these disputes because the record contains ample evidence otherwise that appellants breached the contract.

Whether the contract created one or two leases does not affect our decision. If there was one lease, all the breaches apply to that lease. Even if appellants' continued occupancy of the 57 acres constituted a continuation of the lease terms as to that section of the property, the failure to pay taxes applies specifically to that parcel. Likewise, if the contract created two leases, the default on rent breached one and the tax default breached the other.

**Propriety of termination**

Appellants challenge the district court's conclusion that the lease is no longer in effect. They argue that their substantial compliance should not be overwhelmed by "a relatively insignificant default"—particularly in light of the absence of notice of default provisions in the contract, notice of their default, or the opportunity to cure their default. Wilson responds first that, because there was no meeting of the minds, there was no contract and thus no need to terminate the contract. He alternatively contends that he was within his right to evict appellants.

15

Appellants correctly note that the law disfavors forfeitures, and that courts should not find a forfeiture if such is against equity and good conscience. *See Redman v. Whitney*, 541 S.W.2d 889, 893 (Tex. Civ. App.—Austin 1976, writ ref'd n.r.e.); *T. Anchor Corp. v. Travarillo Assoc.*, 529 S.W.2d 622, 627 (Tex. Civ. App.—Amarillo 1976, writ ref'd n.r.e). These cases turn on facts not present here. In *Redman*, the court reversed a forfeiture based on findings of late rent payments and failure of maintenance by a purchaser; the court found that the two disputed payments were late because of an error and were actually paid during a contractual grace period, and that there was insufficient evidence that the building was in disrepair. *Redman*, 541 S.W.2d at 892. In *T. Anchor*, the overriding equitable factor was the intervention of bankruptcy orders that effectively prevented the buyer from staying current on installment payments. *See T. Anchor*, 529 S.W.2d at 627.

The evidence in this case is not as favorable for appellants as the evidence in the cited cases was for those lessees. Here, appellants' admitted utter failure to pay rent is more severe than payments made late under extenuating circumstances. *See Redman*, 541 S.W.2d at 892. Nor is there evidence that Wilson continued to accept payments after giving notice of forfeiture as in *T. Anchor*, 529 S.W.2d at 628. Here, after Wilson demanded and did not receive rent payments, appellants surrendered the 161 acres; they did not continue in possession of the entire property misled by the lessor's conduct that the failure to pay rent was of no consequence. Appellants' admitted failure to pay taxes as required by the contract they drafted further tips the equity scales against them; their attempted cure of the breach weighs in their favor, but does not require reversal of the district court's judgment. Nor does their repair and construction work on the property tip the balance sufficiently appellants' way. The parties dispute the adequacy of appellants' maintenance and construction work,

16

and there was not, as in *Redman*, evidence from a disinterested witness that the property was in better condition than before appellants assumed control. *See* 541 S.W.2d at 892. Rather, there was evidence from a defense witness who testified that some of the repairs were inadequate, unsafe, and may have negative value because of the remediation required—*e.g.*, roof repairs and other installations necessitated by the inadequate fireplace and chimney installed in the stucco house.

Appellants also contend that Wilson is limited to seeking monetary damages rather than terminating the lease. They cite a case in which the lease provided that, if the lessee vacated the premises, the lessor could mitigate its losses by reletting the property or suing the lessee for all damages resulting from the breach. *See Maida v. Main Bldg.*, 473 S.W.2d 648, 651 (Tex. Civ. App.—Houston [14th Dist.] 1971, no writ). Unlike that lease, the contract between Wilson and appellants lacks any provisions regulating default; accordingly, the limits on the lessor's remedies in *Maida* do not limit Wilson's remedies. Similarly, we find nothing prohibiting Wilson from evicting appellants as they argue, citing *Buffalo Pipeline Co. v. Bell*, 694 S.W.2d 592, 597 (Tex. App.—Corpus Christi 1985, writ ref'd n.r.e.). The *Buffalo* case turns in part on the lease clause that automatically renewed the lease in the absence of a clearly stated intention by the lessor to terminate the lease (*see id*. at 597); there is no such provision in the contract in this case. It also turns in part on the common-law rule that, in the absence of a forfeiture clause, the failure to pay rent gives rise to a claim only for monetary damages. *See id*. at 598. But the eviction in this cause was not predicated solely on non-payment of rent. It was also based on failures to pay taxes. Further, equitable considerations favored the lessees in *Buffalo* that are absent here such as: (1) the lease in that case had existed for 45 years; (2) the nonpayment of rent was due in part to lessees sending the

17

payment to the previous lessors after they sold the property and in part to the payment disappearing after being forwarded from the former lessors to the subsequent lessors; (3) the lessors let lessees remain on the property for months after the nonpayment; and (4) when the lessees learned that lessors had not received the rent, lessees paid and lessors accepted the payment, then tried to renegotiate the lease before moving to evict lessees. *Id*. at 599. Here, appellants were in default almost from the beginning of the lease, and the parties set a precedent under the contract with appellants' abandonment of the 161 acres for failure to pay rent due and calculated on that acreage.

These breaches support the termination of the entire contract, whether it is one lease or two. If the contract comprises separate leases, Wilson terminated the leases after their respective breaches. He evicted them from the 161 acres soon after fewer than six months of nonpayment of rent. He evicted them from the 57 acres after a longer time, but fewer than three failures to pay taxes. If the contract is nonseverable, the multiple breaches of the rent and tax obligations support the termination of the entire lease. Even if we accept appellants' argument that they became holdover tenants when Wilson let them remain on the 57 acres despite the nonpayment of rent, they were still held to the requirements of the contract (with the possible exception of the rent calculated on the abandoned 161 acres). *See Barragan v. Munoz*, 525 S.W.2d 559, 561 (Tex. Civ. App.—El Paso 1975, no writ). Their failure to pay taxes supports Wilson's termination of any remaining contract.

**Injunctive relief**

Appellants contend that the district court erred by granting Wilson's request for injunctive relief. The court enjoined appellants, their agents, and others from "harassing, injuring

18

or killing any of the livestock, domestic or otherwise, belonging to [Wilson]; and, from physically

or verbally harassing or threatening [Wilson]." The court also enjoined appellants from "tampering

with, damaging, or removing any of the appliances, equipment or fixtures which are affixed to the

permanent residential structure situated on the 218.234 acre tract or are located on the real property

such as well pumps, pipes, and electrical motors."

We review the district court's grant of a permanent injunction for an abuse of

discretion. *Envoy Med. Sys., L.L.C. v. State*, 108 S.W.3d 333, 335 (Tex. App.—Austin 2003, no

pet.). Injunctions are available in the following situations:

(1) the applicant is entitled to the relief demanded and all or part of the relief requires the restraint of some act prejudicial to the applicant;

(2) a party performs or is about to perform or is procuring or allowing the performance of an act relating to the subject of pending litigation, in violation of the rights of the applicant, and the act would tend to render the judgment in that litigation ineffectual;

(3) the applicant is entitled to a writ of injunction under the principles of equity and the statutes of this state relating to injunctions;

(4) a cloud would be placed on the title of real property being sold under an execution against a party having no interest in the real property subject to execution at the time of sale, irrespective of any remedy at law; or

(5) irreparable injury to real or personal property is threatened, irrespective of any remedy at law.

Tex. Civ. Prac. & Rem. Code Ann. § 65.011 (West 1997). A trial court's issuance of injunctive

relief is reviewable for abuse of discretion. *Operation Rescue-Nat'l v. Planned Parenthood*, 975

S.W.2d 546, 560 (Tex. 1998). A trial court abuses its discretion when it acts in an unreasonable and

19

arbitrary manner, or without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex.1985). This Court may not reverse for abuse of discretion merely because we disagree with the decision of the trial court. *See id.* A clear abuse of discretion arises only when the trial court's decision is not supported by some evidence of substantial and probative character. *Envoy*, 108 S.W.3d at 335.

The court heard testimony from both sides about their deteriorating relationship. Ten of Wilson's sheep admittedly were killed by appellants' son's dogs; evidence indicated that compensation was promised, but only partly made. Wilson testified that appellants' son and a guest made threatening remarks; the court also heard testimony that Wilson and his son committed intimidating, threatening, and destructive actions toward appellants. The court heard testimony that appellants' son had a hunting blind on part of the land where hunting was forbidden under a temporary injunction; the son denied any hunting was occurring. Wilson and his witnesses testified and introduced photographs purporting to show appellants' mistreatment of the property.

Given the increasing acrimony with which the parties and their relations treated each other, we cannot say that the district court abused its discretion by granting the injunction.

**Attorney's fees**

Appellants next argue that the court erred by awarding $10,000 in attorney's fees to Wilson through trial. They contend that the only basis for the award is the declaratory judgment granted to Wilson pursuant to his counterclaim. A party bringing a counterclaim may recover attorney's fees under the Uniform Declaratory Judgments Act if its counterclaim is more than a mere denial of the plaintiff's cause of action. *See* Tex. Civ. Prac. & Rem. Code Ann. § 37.009 (West

20

1997); *see also BHP Petroleum Co. v. Millard*, 800 S.W.2d 838, 841-42 (Tex. 1990). The counterclaim must seek affirmative relief. *HECI Exploration Co. v. Clajon Gas Co.*, 843 S.W.2d 622, 638-39 (Tex. App.—Austin 1992, writ denied). A request for relief that seeks only an express negation of the relief requested by the opponent does not provide a proper basis for an attorney's fees award under the Declaratory Judgments Act. *See Fowler v. Resolution Trust Corp.*, 855 S.W.2d 31, 37 (Tex. App.—El Paso 1993, no writ). An award of attorney's fees in a suit for a declaration to resolve disputes regarding interest in property is subject to review for abuse of discretion. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 37.004, .009 (West 1997); *see also Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998). Appellants contend that attorney's fees were inappropriate because the relief awarded was nothing more than a negation of appellants' rejected request for relief. Appellants preserved this alleged error for review by raising the issue in their post-trial brief.

The district court did not abuse its discretion by awarding Wilson attorney's fees. Appellants requested a declaration that a valid, severable lease existed and that their right to possess and option to purchase the 57 acres remained in effect. The declaratory relief awarded to Wilson was more than a mere denial of this request. Had the court simply denied appellants' requested declaration, the nature of appellants' interest would remain undefined. Instead, the court declared that appellants have no legal or equitable interest in the property.

Appellants' seventh issue, by which they contend that the district court erred by denying them attorney's fees, is contingent on their prevailing. Because we conclude there was no error in the district court's decision that appellants not prevail, we find no error in the failure to award the nonprevailing party attorney's fees.

21

## CONCLUSION

The district court's findings of fact and conclusions of law contain alternative bases supporting its judgment and declaration that appellants have no legal or equitable interest in the property. The district court concluded that there was no valid contract between appellants and Wilson, that any contract was not severable, and that, whatever the nature of the contract, appellants failed to comply with its terms concerning both the 161 acres and the 57 acres.

We conclude that the district court's findings and conclusions are supported by sufficient evidence and the law. We affirm the judgment.

_____

David Puryear, Justice

Before Chief Justice Law, Justices B. A. Smith and Puryear

Affirmed

Filed:   January 29, 2004

22